Injunction bill. Rule to show cause why a preliminary injunction should not issue restraining the defendant corporation from selling all its assets. Heard on bill and affidavits.
The Pittsburgh Oil Refining Corporation is a corporation of this state with an authorized capital of $7,000,000, divided into 300,000 shares of 8 per cent. cumulative preferred stock, and 400,000 shares of common stock, each of the par value of $10. Both classes of stock have the same voting rights. Of the authorized capital 103,700 shares of preferred stock and 101,182 shares of common stock have been issued and are outstanding. A special meeting of the stockholders of the defendant corporation was called for February 21, 1924, for the purpose of considering the sale of the assets of the company. The letter of the president calling this special meeting is in part as follows:
"Recently offers have been made to purchase the assets of this company. The board of directors wishes to submit to the stockholders the question of the advisability of selling the assets. The company now has a deficit as of December 31, 1923, of $1,231,770.59. During the past year the operations of the company have been fairly profitable, although the earnings are barely sufficient even to provide for the current dividend on the preferred stock. The fact that the company has a large deficit makes it impossible to declare any dividends until this deficit is wiped out. Furthermore, cumulative dividends on the preferred stock are in arrears for more than three years. The offers to purchase the assets, if accepted, would net the preferred stockholders an amount considerably in excess of the recent market price of the stock. The amount to be received would, however, be very much less than the par value of the preferred stock; therefore, of course, there would be no liquidating dividend to the common stockholders."
At the meeting of stockholders a resolution was adopted authorizing the directors to sell all the property of the corporation "upon such terms and conditions as the board of directors in their discretion deem advisable, expedient and for the best interests of the corporation, provided, however, that in no event shall the board of directors sell all of the said property and assets for a sum less than four hundred and fifty thousand dollars ($450,000), or sell such assets as may be salable separately at such price or prices as will, together with the remaining assets not sold, aggregate a total of not less than four hundred and fifty thousand dollars ($450,000); in such case the corporation to be responsible for and to pay all its liabilities." This resolution was unanimously adopted by all of the stock represented at the meeting, viz., by 85,290 shares of preferred stock and 57,549 shares of common stock — a total of 142,839 shares, or a little over 69 per cent. of all the outstanding *Page 47 
stock entitled to vote. The complainant's stock was not represented at this meeting.
Upon the adoption of the resolution by the stockholders, the directors immediately proceeded to take steps to effect a sale of the assets. They invited bids from at least three parties who had theretofore been in negotiation for a purchase of the same. Whether others were invited to bid does not appear. The three parties referred to all submitted bids. One of the bidders was Hood Trading Company. Its bid was to pay $274,235 for certain of the assets free from all liabilities. The corporation was to retain all other assets, continue to carry all its liabilities and retain all profits since January 1, 1924, the date as of which the statement on which bids were submitted was prepared. As of December 31, 1923, the bill shows that the assets proposed by this bid to be retained exceed in value the liabilities by $213,711.67. These assets to be left in the hands of the corporation having a net value of this amount, together with the cash sum of $274,235 proposed by the Hood Trading Company to be by it paid, would make its bid amount to a total of $487,946.67, a sum which upon dissolution would work out a distribution dividend upon the 103,700 shares of preferred stock outstanding of $4.706 per share. In addition, the Hood Trading Company stated' in its bid that it proposed to organize a new corporation to take over the assets proposed to be purchased with a capital stock of not exceeding $500,000 par value of 7 per cent. cumulative preferred stock and $600,000 par value of common stock; that it would offer to the holders of preferred stock in the old corporation the right to take in lieu of liquidation dividends preferred stock in the new corporation at the rate of $5 in par value of such new preferred stock for each share of old preferred stock and in addition thereto $1.50 in par value of the common stock of the new corporation; and that it would also transfer to the old corporation $101,182 par value of the common stock of the new corporation.
Two other bids were submitted in response to the invitation. It is necessary to notice only one of them however, viz., the bid submitted by Poe Davies and their associate Joseph Kennedy. This bid was accepted by the board of directors. It offered to pay in cash $466,650 for all the assets of the selling corporation subject to all liabilities. The price so offered will yield a liquidation dividend of $4.50 upon each share of preferred stock outstanding, leaving nothing for the common stock. The bid submitted by Kennedy-Poe Davies sets forth a plan which the proposed purchasers intended to adopt in case their bid were accepted. This plan contemplates the organization of a new corporation to take over the assets purchased, which would have a capital stock of not more than $518,000 par value of preferred stock and not more than $506,000 par value of common stock. The bidders state their intention to be to permit each holder of preferred stock of the defendant corporation to elect to take $5 in par value of the preferred stock of the new corporation in exchange for his right to receive the $4.50 liquidation dividend, and to permit each holder of the common stock of the defendant corporation to purchase for 50 cents a share the common stock of the new corporation (par value $1), the amount and par value of the new common stock to be purchased to be not more than one-tenth in par value of the common stock of the defendant corporation now held by each of them.
The directors of the defendant corporation rejected the Hood bid and accepted the bid of Kennedy-Poe Davies. The bill was filed for the purpose of enjoining the officers and directors of the defendant corporation from effecting the sale in accordance with the accepted bid.
The bill complains because of an alleged disregard by the directors of the defendant corporation of the provisions of section 64a of the General Corporation Law (29 Del. Laws, c. 113, § 17), in that they have negotiated a sale of all the corporate assets upon terms and conditions that are inexpedient and not for the best interests of the corporation. In Allied Chemical Dye Corporation v. Steel Tube Co. of American (Del.Ch.) 120 Atl. 486, 122 Atl. 142, occasion was taken to discuss the principles of law applicable to that section in such cases as the instant one. In so far as this court can settle those principles, they are settled by that case, and nothing further need now be said with respect thereto. In this case two principal features stand out as distinguishing it from the Steel Tube Case. These are, first, that here the facts fail to show such a control of the majority of the stock as was found in that case; and, second, an element of personal interest or motive similar in character to that found in the Steel Tube Case is lacking in this one. I shall not discuss the evidence which warrants this statement, except to the extent of noticing the contention of the complainant that it does show as a matter of fact that a personal interest or motive on the part of the directors is disclosed. This alleged interest is said to exist on the part of a corporation known as Fidelity Securities Company, which is charged with having obtained control of the stockholders' meetings and the board of directors of the defendant *Page 48 
corporation through the voting power of stock of the defendant corporation owned by it and others responsive to its will. As just stated, the evidence fails to show such a controlling power. But even if it did, there is no appearance of a suspicion-arousing motive or interest peculiar to itself which would raise doubts concerning the faithfulness of the majority of the directors of the defendant corporation to their obligations to it in negotiating the sale in question. It is true the Fidelity Securities Company is a large stockholder in the defendant corporation, owning 44,208 shares of its preferred stock and 14,109 shares of its common stock. Its acquisition of this stock, however, appears to have been with the expectation that the company would be continued as a going concern. There is nothing to indicate that it was with the hope and expectation that a dissolution would take place and a consequent sale of assets and a distribution of the proceeds ensue. According to the evidence it paid at least $8.50 a share for its preferred stock and $5,000 for its common stock. If the proposed sale takes place it will realize substantially $4.50 a share on its preferred stock and nothing on its common stock. It therefore has the prospect of losing a substantial sum on its investment in case the proposed sale is consummated. It appears that the Fidelity Securities Company is itself desirous of dissolving and this desire is said to prompt it to vote its stock in the defendant corporation in favor of a sale of the latter's assets to the end that a cash distribution dividend may be realized on its stock and its own dissolution thereby more readily and conveniently facilitated. It is difficult to see why a liquidation of the defendant corporation is indispensable to the dissolution of the Securities Company, for manifestly the latter on dissolution could distribute to its stockholders the stock of the defendant corporation in kind as readily as it could a cash equivalent therefor. But if it were otherwise, the most that could be said is that the desire to liquidate itself would simply indicate the motive inducing it to vote as a stockholder of the defendant corporation in favor of the sale of the latter's assets and a dissolution distribution thereof in cash. This motive is not such as would disfranchise it as a stockholder of the defendant corporation. It is but a special manifestation of the same motive of personal desire, or perhaps caprice, which doubtless is entertained by every stockholder in any corporation who chooses to cast his vote in favor of discontinuing the corporate enterprise by turning all the assets into cash and making a pro rata distribution thereof on dissolution. There is nothing in the evidence showing it to be attended with circumstances which indicate it to be of a fraudulent nature.
The first essential requirement for a sale of all the assets of a corporation is that the stockholders shall consent thereto. Assuming that the Securities Company controlled the voting majority at the stockholders' meeting (an assumption which is not supported by the evidence), it nevertheless does not appear that a questionable motive on its part exists which can be said to taint the result of that meeting either with fraud or even suspicion. If no such motive exists on the part of the Securities Company, it must be inferred that no such motive can be attributed to the majority of the directors of the defendant corporation who are alleged to be its friendly representatives on the board.
It follows, therefore, that the directors of the defendant corporation are clothed with that presumption which the law accords to them of being actuated in their conduct by a bona fide regard for the interests of the corporation whose affairs the stockholders have committed to their charge. This being so, the sale in question must be examined with the presumption in its favor that the directors who negotiated it honestly believed that they were securing terms and conditions which were expedient and for the corporation's best interests. Indeed, the complainant in his bill and his solicitors at the argument have been at pains to concede to the directors a disposition to act in a manner entirely free from conscious fraud. It is asserted, however, that the directors were so responsive to the will of the Securities Company that their zeal to serve its interests led them to make a bargain which is so unfair as to indicate fraud in law however honest their intent may have been. If this be so, the terms and conditions of the sale must themselves supply the proof.
The next and final step in the consideration of the case must, therefore, be an examination of the terms and conditions of the sale with a view of ascertaining if they are so manifestly unfair as to indicate fraud and thereby overcome the presumption of fairness which otherwise would prevail in their favor. At the outset it is to be observed that the sale of these assets as an entirety was a thing which those heavily interested in the corporation, including the complainant, have had not only in contemplation but as well in actual negotiation for some six or seven years. It is unnecessary to refer in detail to those negotiations. The complainant appears at a prior time to have sought their purchase. He still seeks their purchase for, though his bill fails to disclose the fact, yet his reply affidavit admits that the unsuccessful bid of Hood Trading Company was on behalf of himself and his associates. The directors invited bids from interested parties — from how many does not appear. At all events three bids were received. Some attempt was made to show that the time within which bids were to be *Page 49 
submitted was so short as to forestall a bidding by the Hood Trading Company. But nothing can be made of this, because the Hood bid, as a matter of fact, was submitted. Three bids were received, and it is to be noted that the prices offered by the three bidders were not very far apart in their amounts. It is worth while to notice only two of these bids. The argument has been directed to them only. These were the Kennedy-Poe Davies bid and the Hood Trading Company's bid. The former was accepted. There is a difference on the face of these two bids of about $21,000 according to the complainant, and about $16,000 according to the defendants, in favor of the Hood bid. Yet, the bill complains, the smaller bid of Kennedy-Poe Davies was accepted. If the only difference between the terms of these two bids consisted in the fact that the one offered $16,000 more of cash than the other, there would be no conceivable justification for accepting the smaller bid. As between $487,946 in cash from Hood and $466,650 in cash from Kennedy-Poe 
Davies for all the assets cum onere the liabilities, and injunction ought to issue against an acceptance of the latter. Where the standard of comparison is the absolute one of dollars in hand for the same identical thing, a discretion which would choose the smaller amount would be so manifestly abused as to convict itself of fraud. But such is not the case here. The accepted bid contemplated the payment of $466,650 in cash for all the assets, the purchaser assuming all the liabilities. The rejected bid of Hood contemplated the payment of only $274,235 in cash for a portion of the assets, the defendant corporation retaining $312,- 517.02 of assets and continuing to assume all the liabilities. If all the assets retained by the seller were collected in full and all the liabilities were paid, as they would of course have to be, then the complainant calculates that the seller would realize $213,711.67 which added to the cash payment of $274,- 235 above mentioned would make a total of $487,946,67, the amount represented as the Hood bid. (The defendants calculate the Hood bid as $5,000 less than this sum. In view of the size of the total amount involved, it is not worth while to discuss the controversy over this difference.)
This being the nature and character of the two bids the directors had before them for consideration, it is apparent that a choice between them involved something more than the simple process of deciding between the flat offers of two sums of money tendered by rival bidders for the same identical thing. The directors justify their acceptance of the Kennedy-Poe Davies bid as against the Hood bid principally because of the fact that the former supplied a cash sum in hand for the entire assets subject to liabilities and relieved the defendant corporation from the delay and expense of collecting that portion of the assets which under the Hood bid it would retain. Among these assets appear two items of notes receivable and net accounts receivable, aggregating $169,770.58. The item of net accounts receivable is ascertained by deducting from the gross accounts receivable (about $183,431.02) the sum of $23,356.01 as a reserve against uncollectible accounts. In order for the Hood bid to yield to the company a total of $487,946.67 the company would be required to collect every dollar of the notes receivable and the net accounts receivable. The directors in the exercise of their judgment conceived that the expense incurred in collecting these accounts would equal an amount sufficient at least to outweigh the $16,000 or $21,000 represented on paper as the amount by which the Hood bid exceeded the Kennedy-Poe Davies bid. It is unquestionably true that it would cost some money to collect these accounts receivable. Whether it would cost as much as $16,000, or $21,000, no one can say. It would seem to be true that if the directors are wrong in their judgment as to what it would cost to collect the accounts, the amount by which they are in error can under no circumstances be so large as to argue the existence of fraud. Their error, if any, when stated in percentage of the total amount involved would in all probability appear to be slight.
The complainant points out that the Hood bidder offered to collect the accounts receivable on behalf of the selling corporation without charge or expense therefor. The objection which the directors have to accepting such a proposal is that the accounts would be turned over to a new concern engaged in doing business with people who owe the accounts and that naturally in collecting the accounts the collector would not be disposed to insist vigorously upon settlement. Indeed, they say, the new concern might in order to cultivate the good will of the debtors go so far as to sacrifice the accounts. Whether or not others would agree that the directors displayed sound judgment in rejecting the Hood offer to collect the notes and accounts for this reason, it nevertheless cannot be said that their action was so unreasonable as to be removed entirely from the realm of the exercise of honest and sound business judgment.
Another point upon which the complainant insists as indicating the undesirability of the Kennedy-Poe Davies bid as against the Hood bid is that under the terms of the former the purchaser is to receive all the profits of the business since January 1, 1924, which, if the rate of earnings for 1923 has been maintained, will amount to something like $24,000 whereas under the Hood bid these earnings are retained by the defendant corporation. Without pausing to *Page 50 
discuss the matter, it is sufficient for me to say in reply to this, that I do not so read the terms of the Kennedy-Poe Davies bid. I find no merit in this contention.
Nor can I discover sufficient of merit in the further contentions of the complainant with respect to increase in value of inventories and possible loss to the seller by reason of the guaranty as to liabilities and the possible gain to Kennedy-Poe Davies by reason of the item of reserve for uncollectible accounts, to justify a denunciation of the action of the directors as fraudulent. The argument with respect to inventories would appear to operate impartially between the two bids and the possibilities inherent in the items of guaranteed liabilities and reserve for uncollectible accounts are purely speculative and of such character as should be referred for proper appraisal to the chosen managers of the corporation's affairs. Their judgment, on the showing made at the hearing, should not be interfered with.
The bill is framed on the theory that the directors made an improper choice between two of three submitted offers. Reading the bill in the light of the affidavits, it is impossible to escape the conclusion that the real contest in this case is by an unsuccessful bidder against his more fortunate rival. The argument at the hearing directed itself almost entirely in harmony with this view. By way of parenthesis, so to speak, a new theory was however suggested at the argument, viz. that in none of the bids was a price offered which is a fair and adequate one for the assets of the defendant corporation, and that therefore the sale ought to be enjoined. Before concluding this opinion, I feel disposed to comment upon this theory even though it be a departure from that which the bill and affidavits present. The only bit of evidence suggested as sustaining it is that in 1923 the corporation earned ninety odd thousand dollars. It is urged that a corporation whose earning power is of that amount must be worth more than the amount offered for its assets by the successful bidder. In reply to this it is stated by one of the affiants that while in 1923 this corporation, which theretofore had proved a money loser, did earn the profit mentioned, yet it was because of a new method of business peculiar to itself during that year by which an advantage was gained over competitors, which is now no longer new and which would therefore cease to yield to the defendant corporation the advantage which its novelty had during 1923 afforded. What this method of business was, is not explained. Whether the rate of profits in 1923 can be maintained, the evidence is too insufficient to form an opinion upon. Certain it is that, from the evidence, profitmaking was not the normal experience of the corporation. Whatever its earning capacity was, the complainant knew it and appears to have been fully advised thereupon. With the earning power of the corporation fully known to him, he by his own bid appraised the value of all its assets at the outside figure of $487,946.67, which at the most and under the most favorable circumstances is only about $21,000 above the price accepted. The other bidders, who were informed as to the corporation's condition, were near the same amount in their appraisal as evidenced by their bids. We have therefore three parties, all of whom wanted this property, in substance placing by their bids a market value upon the assets. Not only so, the prices offered were in excess of the value placed by the stockholders themselves upon the assets, for the stockholders by their resolution were willing to receive $450,000, less all liabilities, which according to the complainant's showing aggregated over $90,000. In view of the appraisals thus put upon the assets by rival bidders and by the stockholders of the corporation, it is difficult to see what justification there would be in concluding that a price closely approximating that set by the best bidder and substantially in excess of that which the stockholders were willing to take, is an unfair one, or, if unfair, so much so as to indicate fraud.
One other contention was made by the complainant. This should have been mentioned before. I refer to the contention that the Hood bid was larger than the sum of $487,946.67 because of that feature of its terms which promised to give to the selling corporation $101,182 in par value of the common stock of the new corporation proposed to be organized to take over the business and purchased assets of the old one. This item in the consideration offered by the Hood bid is emphasized as increasing it considerably above the total amount just named, and thus rendering the action of the directors in rejecting it in favor of the Kennedy-Poe Davies bid the more reprehensible. The directors refused to regard the common stock of the new corporation as worth anything. I am unable to persuade myself that their action in this regard is inconsistent with the honest exercise of sound judgment. The length to which this opinion has already been extended restrains me from further prolonging it by elaborating the thoughts which lead me to this conclusion. It may be well to state, however, that in no case could the common stockholders of the old corporation receive the $101,182 par value of common stock of the new corporation, as appears to be the view of the complainant, because the new common stock would constitute a portion of the assets of the old corporation. On dissolution and distribution of the assets of the latter, *Page 51 
the preferred stock would have sufficient preference rights to take it all to the exclusion of the common stock.
I have, I believe, thus far noticed all the contentions of the complainant and answered them after as careful consideration as I can give to the matter. The result is that I find nothing in the terms and conditions of this sale which is so inexpedient or indicates such a disregard of the best interests of this corporation as to justify the interference of this court with its consummation.
A preliminary injunction will, therefore, be denied and the rule discharged.
 *Page 121