116 A.2d 787 (1955)
Helen E. COTTRELL, Plaintiff,
v.
The PAWCATUCK COMPANY (formerly the C. B. Cottrell & Sons Company), a Delaware Corporation, Harris-Seybold Company, a Delaware Corporation, Donald C. Cottrell, Ridley Watts, Arthur M. Cottrell, Jr., and Charles P. Cottrell, Jr., Defendants.
Civil Action No. 465.
Court of Chancery of Delaware, New Castle.
September 28, 1955.
*788 Arthur G. Logan and Aubrey B. Lank of Logan, Marvel, Boggs & Theisen, Wilmington, and A. A. Berle, Jr., Rudolph P. Berle and Robert H. Seabolt, of Berle, Berle, Agee & Land, New York City, for plaintiff.
Henry M. Canby and Louis J. Finger, of Richards, Layton & Finger, Wilmington, for defendants, The Pawcatuck Company, and others.
Richard F. Corroon, of Berl, Potter & Anderson, Wilmington, and Paul J. Bickel and Elmer Jacobs, Cleveland, Ohio, for defendant Harris-Seybold Company.
SEITZ, Chancellor.
Plaintiff brought this action as a stockholder of what was then the C. B. Cottrell and Sons Company[1] ("old company") to enjoin a sale of its "non-liquid" assets to the other corporate defendant, Harris-Seybold Company ("Harris"). Actually the assets were sold to what is now a wholly owned subsidiary of Harris, here designated as the "new company".
For reasons set forth in the Court's opinion, plaintiff did not obtain a restraining order or preliminary injunction preventing the consummation of the sale. See Cottrell v. Pawcatuck Co., Del.Ch., 106 A.2d 709.
Subsequent to the consummation of the sale this case was tried and this is the decision after final hearing. Plaintiff still seeks rescission of the contract and restoration of the status quo. She seeks, alternatively, damages against all the individual defendants, (directors of the old company) against Harris and against the new company. Plaintiff claims that the purchase price specified in the agreement of November 9, 1953, was grossly inadequate and that the agreement was executed by the old company acting through its majority directors and majority stockholders in reckless disregard of and deliberate indifference to the rights of the minority stockholders. Defendants deny the charges.
Preliminarily, I conclude that plaintiff has the burden of proof and while the directors and majority stockholders owed a fiduciary duty to the plaintiff nothing appears which would divest their actions of the presumption of good faith. The stock ownership of the directors and the possibility that some of them would continue with the new company do not destroy this presumption. This has been repeatedly held in Delaware. Bennett v. *789 Breuil Petroleum Corp., Del.Ch., 99 A.2d 236.
Plaintiff first claims that there was no valid director approval of the agreement of sale as required by the Statute, 8 Del.C. § 271. Plaintiff says some of the directors lacked knowledge of values and proceeded to vote approval though uninformed. Time does not permit an analysis of the situation. But I conclude that the action taken at the directors' meeting of November 12, 1953 to authorize the sale of assets did not violate the Delaware Statute, 8 Del.C. § 271. See Allied Chemical & Dye Corporation v. Steel & Tube Co., 14 Del.Ch. 64, 122 A. 142. It is true that not all the directors were fully conversant with all the value factors involved. But that does not mean the approval is invalid. See Schiff v. RKO Pictures Corp., Del.Ch., 104 A.2d 267, 268, at page 279. To the extent lack of knowledge is material, I think it more appropriate to consider it in connection with the question of the alleged fraud in the fixing of the purchase price.
It appears that the majority stockholders of this essentially "family" corporation decided to sell the stock but when it appeared that not all the stock could be sold the "deal" was converted into a sale of assets. Essentially the "selling" majority group of stockholders were interested in receiving a sum which would give them $500 per share for their stock but this does not mean that the aggregate figure was unrelated to their opinion as to the reasonable value of the assets sold.
This is a typical case where each side emphasizes certain value factors and minimizes others, leaving the Court the task of sorting out these various factors and thereafter according them appropriate weight. The imponderables and pitfalls inherent in this process are noted in Bonbright, Valuation of Property, p. 251, et seq.
The agreed purchase price for the assets purchased amounted to $3,553,997 subject to certain inventory adjustments which ultimately reduced the price to $3,194,448. The purchaser paid the old company by cash, by certain of its shares of stock, and by the assumption of its liabilities. The old company retained assets worth about $2,500,000.
Plaintiff claims that the going concern value of the assets sold, which in reality constituted the business and inventory, amounted to at least $5,650,000. Defendants contend that the going concern value was not in excess of $4,000,000 and probably less.
I have no doubt that here the going concern value is vastly more important than book value. Compare Allied Chemical & Dye Corporation v. Steel & Tube Co., above. The disparity in the going concern value between that suggested by plaintiff and that urged by defendants is so great that not even in a "valuation" case can both be reasonable.
Plaintiff's expert stated that the going concern value of the assets sold came to $5,650,000. The general basis for his figures are shown by the following figures taken from plaintiff's brief:

Earning Value $6,150,000
Rockets Value 300,000
 ___________
 ($6,450,000)
Less: Adequate Cash for
 Working Capital purposes
 and therefore required to be
 advanced by the Purchaser
 in order for the business to
 function 800,000
 _________
Going Concern Value of the
 assets sold $5,650,000

Since "earnings value" is the substantial item involved in the chart let us see how this figure was reached. The testimony was that this emerged from the following process:
1. A three year moving average[2] from 1946 to 1953 was compiled, using *790 the figures for the annual net income before income taxes.
2. The average was charted, and on the basis of the expert's evaluation of future prospects the curve was levelled off at $1,175,000 per annum exclusive of profits from rocket operations (hereafter discussed).
3. The projected annual net profits figure of $1,750,000 was reduced by estimated annual taxes of $611,000 leaving an estimated net annual income after taxes of $564,000, once again, exclusive of rocket profits.
4. The expert then applied several methods and various rates of capitalization to this figure and presumably came up with the earnings figure of $6,150,000 to which was added $300,000 for rockets and from which was deducted an item of $800,000 representing, says plaintiff, the additional working capital required to be advanced by the purchaser. The resultant figure is $5,650,000 which plaintiff says is the minimum going concern value of the assets sold.
In her brief plaintiff has treated the $300,000 rockets' profit as an unrestricted plus in arriving at going concern value. This is contrary to the report of plaintiff's own expert. The report of plaintiff's expert indicates that the rocket profits are to be considered for two years only and the estimated figure is before taxes.
I pass by the foregoing infirmities in plaintiff's approach and consider the reasonableness of plaintiff's going concern value figure of $6,150,000. Necessarily implicit in the earnings value used by plaintiff's expert is a capitalization rate of about eleven times the estimated net annual income after taxes of $564,000. Plaintiff contends this is a reasonable capitalization rate.
Defendants claim that seven or eight times such earnings would be the highest justified for this corporation. Eight times would amount to $4,512,000. If we add some reasonable figure for rockets' profits (I take $75,000) we arrive at a figure of $4,587,000. From this we deduct the $800,000 which plaintiff admits the purchasing corporation had to advance (since it took the business without its cash) and we come to a going concern value for the assets sold of $3,787,000 for which the purchaser paid $3,194,448. This disparity is substantial but if we adopt a capitalization figure of seven we arrive at a figure approximating the amount actually received for the assets sold.
Thus, assuming without deciding that plaintiff's estimate of future net earnings before rocket profits is sound, it is apparent that a vital issue for determination is whether plaintiff's capitalization rate of eleven to twelve or defendants' capitalization rate of seven to eight is proper here. I say this because the spread is too great to be written off as being within the range of reason. If plaintiff's rate is sound then we must examine the other value factors involved. If defendants are correct then the consideration received for the assets sold was not legally inadequate when tested by this method.
The task of finding a realistic capitalization rate is fraught with difficulties. Moreover, it can be misleading if the figures are used apart from the facts surrounding the particular corporation involved. See 1 Dewing, Financial Policy of Corporations (1953) p. 287 et seq.; Bonbright, Valuation of Property, p. 262, et seq. It is therefore appropriate now to consider the old company before discussing capitalization rates. The original business in partnership form was established in 1855. It became a corporation in 1893. It has always been a "family" controlled business and that has been the basis of some of its difficulties in recent years. It was engaged in the manufacture of heavy printing presses and was one of the major producers in the industry. The industry is admittedly characterized by substantial "ups and downs". This firm had a very shallow top management reservoir. Its profits history has been reasonably good and its plants adequate. In the past three years it also manufactured *791 rocket parts for the Navy but the future of this operation is highly speculative.
Having in mind that this is an old family managed heavy industry business, it is now in order to consider possible capitalization rates applicable to this type of industry.
Mr. Dewing in his work on Financial Policy of Corporations describes the various rates and I believe the old company would come under the class discussed in the following quotation from Vol. 1, p. 388, (Fifth Edition):
"Businesses which have been established for some time, but are of a highly competitive character, belong to the next class. This would include corner grocery stores operated by managers of such superior business ability that they survive over a considerable period of time. It would include factories manufacturing goods under patent and trademark monopolistic conditions  large factories making stable merchandise with heavy investment in machinery so that the establishment of competitors is difficult and costly. Such businesses, because of large assets, have a comparatively easy access to investment capital. Corporations of this character have a value of from eight to seven times the normal earnings  the earnings capitalized on a 12½% to 15% basis."
Under the circumstances I think it reasonably clear that the old company here would come within the quoted material and reasonably justify a seven or eight times normal earnings capitalization rate. I recognize that this problem is not one calling for the automatic application of certain figures. Certainly a range of reason is involved. Compare Jacques Coe & Co. v. Minneapolis-Moline Co., 31 Del.Ch. 368, 75 A.2d 244. Consideration of the corporation here involved does not call for any extreme variation in the rate. Even plaintiff's expert recognized that the company's normal business fluctuated greatly. This tends to depress the rate. Moreover, the purchaser's approaches to valuation of the assets included that here adopted. It must therefore be considered in determining fair value. See Allied Chemical & Dye Corporation v. Steel & Tube Co., above.
The use of the capitalization rate range suggested by defendants is found to be reasonable. Its use results in a going concern value not grossly disparate to the purchase price. It follows that the plaintiff has failed to sustain her burden of showing that the assets were legally undervalued when viewed from a going concern viewpoint.
Plaintiff places independent reliance on the disparity between book value and the sale price as tending to show legal inadequacy. The sale price was $3,194,448. The book value of the assets sold was $6,539,345. Plaintiff's expert fixed a liquidation value of $5,110,000 on these assets. But these values are subject to substantial question because they include inventories which have a very limited value except when completed. They also include assets which warranted a tax refund because they had depreciated substantially from their book value.[3] Also the value ascribed to the plants and equipment is "anybody's guess" when you consider their value apart from the purpose for which they were used. I cannot find a disparity of the type required to condemn the sale. My conclusion applies also to the alleged liquidation value argument.
*792 This was a sale of assets case which was inevitably headed for court. The history of the relationship between the plaintiff and management made it inevitable. If it were the court's function to pass upon the wisdom of the sale, I would be presented with a more difficult task. The human relations problem is real when a family controlled corporation is involved and certain members have obtained a living from it while the minority members waited for their benefits and then saw the business sold to strangers. But this court is not permitted under law to substitute its idea of the proper course of conduct for those having control where there has been statutory and equitable compliance with the prerequisites to a sale of the assets.
It will take a stronger case than is here made to justify the inference that the majority stockholders accepted a price grossly disparate to the value of the assets sold. The possible additional benefits flowing to them by virtue of the sale cannot reasonably compare with the capital loss they have suffered if plaintiff's valuation argument is correct. This is not conclusive but it tends to negate the argument that the majority was not seeking the "high" dollar in making the sale.
I conclude that the plaintiff failed to sustain her burden of showing that the assets of the old company were sold for a legally inadequate price.
In view of my conclusion with respect to the validity of the sale from the viewpoint of the old company it necessarily follows that there is no liability on the part of the purchaser  Harris. Moreover, I am convinced that, regardless of the correctness of my conclusion regarding the selling corporation and its directors, the purchasing company purchased the assets in an arms-length transaction. I find no evidence to support the charge that it purchased the assets with knowledge of a violation of a fiduciary duty by the directors of the selling company.
I regret that my prolonged commitments do not permit me to narrate the facts and my conclusions at greater length and with greater particularity. I have tried to set forth those matters which upon examination seem of primary importance.
It follows that there is no merit to plaintiff's complaint and it will therefore be dismissed.
Order on notice.
NOTES
[1] Later its name was changed to The Pawcatuck Company.
[2] The amount shown for each year is the annual average for that year and the two previous years. It was used, according to plaintiff's witness, to smooth out yearly variations, if they occur.
[3] Parenthetically, I agree with plaintiff that the tax refund cannot be added to determine the fairness of the sale price. It came not in partial payment by the purchaser for any assets purchased but from the loss arising from the price at which the assets were sold. I have therefore not used the tax refund in determining the adequacy of the sale price. However, I do not intend this to mean that the tax consequences are to be ignored in determining the overall wisdom of the decision to sell.