HAROLD K. BARON,
Appellant,

*vs.*

PRESSED METALS OF AMERICA, INC., a Delaware corporation, and
FREDERICK W. RICHMOND,
Appellees.

*Supreme Court, On Appeal, July 5, 1956.*

584

*William E. Taylor, Jr.,* Wilmington, and *Nathan B. Kogan,* New York City, for appellant.

*Fowler Hamilton,* Cleary, Gottlieb, Friendly & Hamilton, New York City, and *John P. Sinclair,* Berl, Potter & Anderson, Wilmington, for appellees.

SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, JJ., sitting.

SOUTHERLAND, Chief Justice: Plaintiff below, holder of 200 shares of common stock of Pressed Metals of America, Inc., a Delaware corporation, sued to enjoin a sale of certain assets of the corporation to the defendant, Frederick W. Richmond, on the ground that the consideration was grossly inadequate. The case was fully heard by the Vice Chancellor on depositions, testimony, and exhibits. The Vice Chancellor found that the terms of the sale were fair and that no breach of the directors' fiduciary duty had been proved. He accordingly dismissed the complaint, and the sale was consummated. Plaintiff appeals.

The facts are these:

Before the sale Pressed Metals was engaged in the manufacture and sale of parts for automobiles. After 1933 its principal product was a threaded bearing used in connection with the front wheels of an automobile. Except during the war, its principal customers were the "Big Three" of the automobile industry—General Motors, Ford, and Chrysler. Over ninety per cent of Pressed Metals' sales were made to them. By the use of specialized equipment, and because of the volume of its sales, Pressed Metals was able to furnish the product to these companies at a price lower than that at which any of them could make it for itself. This specialization, however, entailed a potential weakness, since loss of the threaded bearing business would leave Pressed Metals with much of its machinery unusable for other purposes.

During the years 1951 to 1954 a large part of the business was lost. The use of Pressed Metals' product was discontinued by Ford on all its cars, and by General Motors on the Chevrolet. The loss of Ford and Chevrolet sales represented a loss of about a third of Pressed Metals' business. Moreover, Chrysler sales declined substantially.

During the spring of 1954 the company had labor trouble, and in June the management informed the union that unless various practices were changed and union rates reduced the company would have to liquidate.

Earnings were, of course, adversely affected. From 1950 to 1954, inclusive, income before taxes declined from $2,776,569 to $192,763; net income from $1,467,569 to $147,578; and earnings per share from $4.30 to $.43. On June 26, 1954, the Board of Directors authorized the officers to investigate and determine the best method of selling or disposing of the assets in the interest of the stockholders.

The officers discussed the matter with representatives of ten or twelve companies. Only one offer was made.[1] In December of 1954

1. Apparently, the specialized character of Pressed Metals' business limited the field of possible purchasers. Richmond said *"Only someone who is well diversified can afford to swallow this company."*

Thompson Products offered a price that would have yielded about $12.50 a share to the Pressed Metals stockholders. As of December 31, 1954, a share of Pressed Metals had a book value of about $23.60. This offer was rejected as inadequate.

In February, 1955, Richmond offered a price that would have yielded the stockholders about $15 a share, payable $9 in cash and $6 in debentures. This offer was also rejected.

In March, 1955, Bellanca Aircraft Corporation offered to buy Pressed Metals' assets at book value for Bellanca stock at its market value. The directors of Pressed Metals were unable to find out much about the Bellanca Corporation, but believed that the real value of the stock was much less than its market value. However, they submitted the offer to the stockholders, by whom it was rejected.

In May, 1955, Richmond made a second proposal. He offered to acquire the assets of Pressed Metals and assume its liabilities for a price of $6,800,000. This would have yielded about $20 a share to the stockholders. As of May 31, 1955 the book value per share was $23.75. The board was interested. Negotiations resulted in increasing the offer to $7,003,100, the equivalent of about $20.50 a share. This total, however, includes the sum of $712,700 to be advanced by Richmond against an expected refund to Pressed Metals of federal income taxes. This refund will arise by reason of the sale of the assets at less than book value.

Thereafter, on June 28, 1955, the board approved the sale and directed the calling of a stockholders' meeting to consider it. At the stockholders' meeting of August 16, 1955, the vote was 264,690 shares in favor of the sale and 8,538 shares against it.

The charge of gross inadequacy of consideration calls for a comparison of the value of the consideration paid and the value of the assets sold. The parties are at odds upon both values.

## 1. The Consideration.

The terms of sale are evidenced by two agreements, a purchase agreement and a supplemental agreement, dated July 14, 1955. The

substance of the purchase agreement is that Pressed Metals is to sell to Richmond all its assets except cash, government securities, and trade accounts receivable (the retained assets); Richmond is to assume Pressed Metals' liabilities; and Richmond is to pay in cash an amount equal to the difference between $6,290,400 and the value of the retained assets as of the accounting and closing dates fixed by the contract. The supplemental agreement deals with the claim for refund of $712,700. Richmond advances to Pressed Metals an additional $712,700, repayable to him only out of the proceeds of the claim, which he is empowered to prosecute on behalf of Pressed Metals.

The transaction may be stated thus: the value of the retained assets, plus the cash payable under the purchase agreement, plus the advance of $712,700, equals $7,003,100. This represents about $20.50 a share for the Pressed Metals stockholders. If the advance of $712,700 be eliminated, it represents about $18.40 a share.

In submitting the sale to the stockholders, the management used figures derived from the balance sheet of May 31, 1955. The following is an abbrevated summary of the figures in the proxy statement:

| | | |
|---|---|---|
| Assets to be sold, as shown by accounts at May 31, 1955 (chiefly inventories, plant and equipment, and investment in subsidiary) | | $4,902,826. |
| Consideration to be received: | | |
| Cash | $2,063,480. | |
| Liabilities assumed | 431,503. | 2,494,983. |
| Loss | | $2,407,843. |

If to the sum of $2,494,983 there be added the amount of $712,700 advanced by Richmond under the tax refund agreement, the total consideration received by Pressed Metals becomes $3,207,683 for assets having a book value of $4,902,826. This is the corporation's view of the matter.

Plaintiff, however, says that neither the amount of liabilities assumed nor the amount of the advance against the claim for refund is a proper element of the consideration.

■ As to the first amount the Vice Chancellor held it a part of the consideration. That he was right is too clear for argument.

■ The second item—the advance against the tax refund—presents a question of some difficulty. The Vice Chancellor did not find it necessary to pass upon it. A somewhat similar question was presented to the Chancellor in *Cottrell v. Pawcatuck Co., ante p.* 309, 116 *A.2d* 787, involving a sale of corporate assets at a loss. He held that the amount of a prospective tax refund could not be considered in computing the amount of the consideration, because it was not money paid by the purchaser in partial payment for the assets but arose solely by reason of the sale itself. But the corporation contends that here the purchaser paid over—in effect, as a part of the purchase price—an amount equal to the expected refund in return for an agreement to allow him to recoup a portion of that price out of any refund to be allowed in the future. The payment is irrevocable, provided only that the corporation cooperates in obtaining the refund. There is some force in this argument, but in the view we take of the case it is unnecessary to decide the point. It is clear, however, as the Chancellor said in the *Cottrell* case, that the tax consequences of a sale are not to be ignored by directors in determining the wisdom of the decision to sell.

We shall assume that the total consideration paid for the assets sold, which had a book value of $4,902,826, is $2,494,983.

## 2. The Value of the Transferred Assets.

■ If the book value be taken as indicating real value, the price is about one-half of that amount. The disparity is substantial, but book value is not conclusive evidence of real value, as both sides agree. The "going concern value" is of much more importance in many cases of sales or of mergers. *Allied Chemical & Dye Corp. v. Steel & Tube Co.,* 14 *Del.Ch.* 64, 122 *A.* 142; *Sterling v. Mayflower*

*Hotel Corp.,* 33 *Del.Ch.* 293, 93 *A.2d* 107, 38 *A.L.R.2d* 425; *Cottrell v. Pawcatuck Co., supra.* "Going concern value" is based upon the demonstrated capacity of the corporation to earn money and pay dividends. The Vice Chancellor gave special weight to this standard of value. He held that the transferred assets did not have a value of more than eight to seven times normal earnings. He did not specify what he regarded as "normal" earnings. The rapid decline of Pressed Metals' business in the years prior to the sale makes the determination of such a figure difficult. True, there was an upturn in earnings in 1955; as of July 31 it was $1.39 a share. But at the time of the sale the earning capacity of the corporation was uncertain. Pressed Metals averages the net earnings for the four years 1951-1954, uses a factor of eight times earnings, and subtracts $1,600,000 as working capital. It thus arrives at a value for the transferred assets of $2,228,000. In the light of the corporation's financial difficulties, this result does not seem unreasonable; but the figure of $1,600,000 is not really supported by evidence, and the result is therefore open to question.

In this case it is unnecessary to find a valuation wholly on the record of earnings. This is a case in which market value— the sum a willing purchaser would pay—is of especial importance. *Allaun v. Consolidated Oil Co.,* 16 *Del.Ch.* 318, 147 *A.* 257, 262. In 1954 Pressed Metals was faced with a very serious loss of business and with serious labor troubles. The directors determined to sell the machinery, equipment and plant. The best price they could hope to get was what someone would be willing to pay. The record shows that they made every effort to find a purchaser. The facts are set forth above. Three offers were made and rejected; and finally after eleven months the present offer was made. The directors negotiated a slightly better price and accepted it. "From the field of possible purchasers they took the best offer." *Allaun v. Consolidated Oil Co., supra.* There is no suggestion that any director made any personal profit from the sale. The judgment of the directors is entitled to the presumption that it was exercised honestly and in good faith. *Robinson v. Pittsburgh Oil Refining Corporation,* 14 *Del.Ch.* 193, 126 *A.* 46.

■ The legal principles applicable to the case have long been settled in Delaware. When disparity is alleged between the value of the assets sold and the consideration received, plaintiff has the burden of showing such a gross disparity as will raise an inference of improper motives or reckless indifference to or intentional disregard of stockholders' interests. *Allied Chemical & Dye Corp. v. Steep & Tube Co., supra; Schiff v. RKO Pictures Corp.,* 34 Del.Ch. 329, 104 *A.2d* 267, 271.

■ Under the facts in this record we are of the opinion that the disparity between the book value of the transferred assets and the consideration paid raises no inference of improper motives or reckless disregard of the stockholders' interests.

Plaintiff, however, insists that the real value of the transferred assets greatly exceeded their book value. He agrees that book value is not conclusive, but says that in this case it should be increased— not reduced. By a process of starting with book value and adding a succession of what he calls "plus factors", he arrives at a figure of $15,147,774 *plus* as the value of the transferred assets. This staggering total represents a minimum value of $55 for a share of stock that had earned a yearly average of $1.40 for the four years preceding the sale. This value is 39 times earnings—a rate so out of all reason as almost to suggest wilful exaggeration.

How does plaintiff attempt to sustain this figure? His plus factors are as follows:

(1) Excess of Appraised Value Over Book Value.

(a) *Pressed Metals.* In December 1954 an appraisal was made by Manufacturers Appraisal Company of the land, buildings and equipment of Pressed Metals and of Acorn Products, its wholly-owned subsidiary. This appraisal was made on the basis of reproduction cost less depreciation. For Pressed Metals it shows a sound value of these assets of $7,470,860.55; and a liquidation value of $2,471,284. Plaintiff seizes upon the sound value, ignoring the other figure, although it might well be said that in the circumstances here presented the liquidation value was nearer to the market value than

was reproduction cost. Comparing the sound value in the appraisal with the book value of these assets of $3,084,674, he finds a plus factor of $4,396,000, which he says should be added to the book value of the assets conveyed.

Reproduction cost less depreciation is one recognized method of valuation, particularly in connection with a utility rate base in some states. But it is of little value in determining the market value of such assets. Market value does not contemplate cost or replacement value; it pre-supposes a willing buyer and a willing seller. It is apparent from the appraisal company's letter outlining its method of appraisal that one of the purposes of the appraisal was the ascertainment of insurable values for fire insurance. In the light of the decision to sell or dispose of the assets the appraisal figures are of little importance. What prospective buyer of this corporation would have based his offer on any such figures?

Plaintiff says that the management of Pressed Metals used the appraisal figures to support its recommendation to the stockholders in April, 1955 that the Bellanca proposal be rejected. Hence, says plaintiff, the management cannot now "repudiate it" (the appraisal). What this means is not clear. The proxy statement spoke of the "going concern values and the future prospects of Pressed Metals", and plaintiff seems to imply that the directors, having used this language, adopted reproduction cost as "going concern value", and could not thereafter sell the assets on the basis of the best offer they could get. If that is the contention, it is obviously unsound. The Vice Chancellor held that the appraisal "was not accepted by the corporate defendant's directors as an accurate reflection of market value for specialized plant and equipment under current business conditions". *Ante p.* 325, 117 *A.2d* 357, 362, 363. We agree.

We are of opinion that the valuations in the Manufacturers' appraisal have little, if any, bearing upon the question before us.

(b) *Acorn Products.* Plaintiff finds a plus factor in the difference between the book value of the Acorn stock on Pressed

Metals' books and the value of its assets appearing in the Manufacturers' appraisal. For the reasons stated above, this plus factor is likewise rejected. There is a difference between the value on Pressed Metals' books and the net worth of Acorn as shown by its books of about $153,000. This is too small an amount to have any bearing on the result.

## (2) Patent Claims.

Other plus factors added by plaintiff to book value are built upon contentions relating to certain patents held by John W. Leighton, the president of Pressed Metals, covering various devices manufactured and sold by Pressed Metals over a period of more than twenty years.

The facts are these:

Mr. Leighton has been the guiding spirit of Pressed Metals. His inventive ability, the Vice Chancellor found, provided the basis for the corporation's success. He developed and patented numerous devices that the corporation manufactured and sold to the automobile companies. Beginning in 1931, he entered into a series of agreements with Pressed Metals by which the corporation was granted from time to time exclusive licenses to manufacture and sell his inventions in return for a royalty of five per cent. From time to time he waived part of the royalties due him under these contracts. In recent years his maximum annual royalty has been $75,000—an amount substantially less than that actually due.

In connection with the sale of Pressed Metals' assets, Richmond agreed with Mr. Leighton and his son, John D. Leighton (also an officer and director of Pressed Metals), to buy all of their patents, applications and developments for $500,000. Richmond also arranged to employ them as executive officers of the corporation that he formed to take over the transferred assets.

Plaintiff makes certain contentions with respect to the patent situation, upon which he builds four more plus factors totaling $5,356,000. They are as follows:

(a) Value of the Right to Royalties—$500,000.

Plaintiff contends that Leighton has no valid claim to the patents, or to royalties thereon. He says the patents belong to Pressed Metals. Therefore, he says, the sum of $500,000 paid by Richmond for the patents rightly belongs to Pressed Metals, and the value of the patents so determined should be added to the balance sheet.

This contention, as we understand plaintiff's brief, is bottomed upon a claim that Leighton, as an officer and director of Pressed Metals, was employed to make and develop inventions in Pressed Metals' time and with Pressed Metals' money, and that therefore the royalty agreements are unconscionable and in equity the patents and all rights therein belonged to Pressed Metals.

[18] The answer to this contention is clear. As the Vice Chancellor said, the title to these patents, as between Leighton and Pressed Metals, cannot be adjudicated in a suit to which Leighton is not a party. The most that plaintiff can make of this contention is that the corporation, through a minority stockholder, has a disputed claim to the patents. It does not even positively appear that the claim has been asserted in a suit filed for the purpose. Assuming that such a suit is pending, what was its value at the time of the sale? As to this, the plaintiff adduced no evidence.

Plaintiff's contention comes to this: that the court on the basis of a legal principle that may or may not be applicable to the facts when proved, should take his claim at its face value. Such a contention is obviously untenable. Compare *Schiff v. RKO Pictures Corp., supra,* in which evidence of the value of an undetermined lawsuit was presented to the Chancellor, on the basis of which he determined the valuation to be placed upon the litigation as an asset of the corporation.

But this is not all. On behalf of the defendant the evidence tended to show that for more than twenty years the royalty agreements were recognized as valid and enforceable by Leighton and by the corporation. In 1939 the stockholders were specifically notified of the terms of the agreements. Thereafter the amounts of the royalty

payments were included in the annual reports of Pressed Metals to the Securities and Exchange Commission. The sale of the patents to Richmond was disclosed in the proxy statement sent in connection with the stockholders meeting of August 16, 1955.

On the evidence, the Vice Chancellor made a specific finding that the patent license arrangement was accepted by Leighton and the corporate directors "as a method of compensating Mr. Leighton for his enormous contribution to the business."

Upon this finding, which we accept, the Vice Chancellor was quite right in refusing to attribute any ascertainable value to the claim to the patents.

### (b) Royalties Paid to Leighton.

Plaintiff adds another factor based on the contention that Pressed Metals was the owner of the patents. This is the amount of patent royalties paid to Leighton from 1939 to 1955—$856,000. Since we have rejected that contention, this factor is likewise rejected.

### (c) Value of Exclusive License.

Plaintiff adds two other factors of $2,000,000 each. These are derived in this manner:

Assume, says plaintiff, that the royalty agreements are valid. Nevertheless, the exclusive license rights of Pressed Metals constitute in equity an assignment of the patents, *Matzka Corporation v. Kelly Dry-Pure Juice Corporation,* 19 *Del.Ch.* 359, 168 *A.* 70, and these patents, says plaintiff, and the "bundle of rights" they represent, must be deemed an asset of the corporation of substantial value. Plaintiff suggests that these rights, in respect of products in production, should be valued at $2,000,000; and that such rights, in respect of new products, should likewise be valued at $2,000,000.

Since under plaintiff's first contention (that Pressed Metals owned the patents outright, the total value of the patents is said to be $500,000, it is impossible to understand how he can even attempt to support a value of $4,000,000 for the patents burdened with royalty payments. But the short answer to his contention is that it simply

represents a difference of judgment between him and the directors, who have refused to place any definite value on this intangible asset, and that plaintiff has failed to adduce any evidence whatever to show that the directors' judgment was grossly erroneous. The first figure of $2,000,000 is simply "pulled out of the air"; the second is derived from an offer of a bank to lend Pressed Metals $2,000,000—obviously no justification for valuing the patents on new inventions at the same figure.

▪ The Vice Chancellor was clearly right in refusing to add any plus factor derived from these contentions about the patents.

### (3) Good Will and Covenant Not to Compete.

Finally, plaintiff attempts to find additional value in (a) good will and corporate name, and (b) a covenant in the purchase agreement not to compete with Richmond. As to these the Vice Chancellor said:

"No specific value is placed on these factors, and I do not find it necessary to evaluate them. Because John D. Leighton's abilities were the life blood of Pressed Metals, and because the corporation's earning record in recent years has not been impressive, I do not think corporate good will is a measurable factor. As for the agreement not to compete, it would appear that the future of the selling corporation is one of orderly liquidation after limited continuance as an investment trust for tax purposes. It has surrendered nothing of value in agreeing not to compete." [26, 27] We approve these findings.

It follows that none of plaintiff's plus factors is accepted as an asset of Pressed Metals.

Plaintiff makes several subsidiary points.

▪ He says that the directors, or some of them, were actuated by improper motives in approving the sale. This contention is founded upon the fact that after Pressed Metals had announced its determination to sell or dispose of its assets, a group of New York brokers bought a large number of shares in the expectation of a

capital gain, since the market value of the shares was lower than the probable liquidation value. Four representatives of this group became members of the board. We fail to see anything wrong in this. Plaintiff disclaims any imputation of secret profits. There is no reason to believe that any of the directors in approving the sale was prompted by any motive except to obtain the highest price possible. This argument, like some others interspersed in plaintiff's brief, seems to be directed to a contention that the assets should not have been sold at all.. The decision to sell was that of the stockholders, and it is not reviewable by the courts. *Allied Chemical & Dye Corp. v. Steel & Tube Co.,* 14 Del.Ch. 64, 122 A. 142.

We find no substance in this contention.

Plaintiff asserts that the proxy statement failed to disclose certain material facts. It is said that no mention was made of the fact that a new device of Leighton's had been ordered by Pontiac "and promises to obtain general acceptance". This is an attempt to build a record of performance out of expectation. The proxy statement disclosed the improved earnings of 1955, and this was sufficient.

Plaintiff says that there was a failure to disclose the fact that a bank had offered to lend Pressed Metals $2,000,000, and that the management was of opinion that profitable operations could be continued. In the light of the corporation's liquid condition this fact is without significance.

An argument is made that the terms of the sale are unfair because operating profits of Pressed Metals during the period between the date of the agreement and the accounting date had the effect of increasing the amount of the retained assets and thus reducing the amount of cash payable by Richmond. But if there had been operating losses (as apparently there were during June and July), Richmond would have paid more. As the Vice Chancellor said, the contract was designed to work both ways. We see nothing unfair about it.

Upon the entire record, the Vice Chancellor held that the plaintiff had not sustained the burden of proving that the proposed

sale was a violation of the fiduciary duty of the directors and majority stockholders. We are in accord with his conclusion, and the judgment below is affirmed.