GOLDEN TELECOM, INC.,
Respondent Below,
Appellant,

v.

GLOBAL GT LP and Global FT Ltd.,
Petitioners Below, Appellees.

No. 392, 2010.

Supreme Court of Delaware.

Submitted: Dec. 8, 2010.
Decided: Dec. 29, 2010.

Raymond J. DiCamillo (argued) and Margot F. Alicks of Richards, Layton & Finger, P.A., Wilmington, Delaware; David M. Zensky, Samidh Guha, and Monica T. Duda of Akin Gump Strauss Hauer & Feld LLP, Of Counsel, New York, New York for appellant.

John L. Reed (argued), Paul D. Brown, K. Tyler O'Connell and Aleine M. Porterfield of Edwards Angell Palmer & Dodge LLP, Wilmington, Delaware for appellees.

Before STEELE, Chief Justice, HOLLAND and BERGER, Justices.

STEELE, Chief Justice:

On February 28, 2008, after a tender offer, Golden Telecom, Inc. merged into Lillian Acquisition, Inc., a wholly-owned subsidiary of Open Joint Stock Company Vimpel–Communications. Golden remained as the surviving entity, and all tendering Golden shareholders received $105 per share. Global GT LP and Global GT Ltd. (collectively, Global), Golden shareholders, sought appraisal. The Court of Chancery valued Golden at $125.49 per share. Golden appealed, Global cross-appealed, and we affirm.

## I. FACTS AND PROCEDURAL HISTORY

Golden incorporated in Delaware in 1999, and has been traded on NASDAQ since going public in September 1999. Its two largest shareholders at all relevant times were Altimo and the Telenor Group, owning approximately 27% and 18% of Golden, respectively. In early 2007, VimpelCom notified Golden that VimpelCom wanted to acquire Golden. Altimo and the Telenor Group were also the two largest

shareholders of VimpelCom, owning approximately 35% and 30%, respectively.

On May 17, 2007, Golden formed a special committee of independent directors, unaffiliated with Altimo and Telenor, to assess and pursue potential transactions. In early September 2007, VimpelCom proposed a tender offer to Golden at $80 per share. In late September 2007, VimpelCom proposed a refined range of $80 to $95 per share, in conjunction with Golden's rising stock price. On November 12, 2007, VimpelCom again raised its offer to $100 per share. The special committee rejected the offer. On November 28, 2007, VimpelCom offered $103 per share, and the special committee again rejected the offer.

On December 1, 2007, VimpelCom offered $105 per share, and on December 3, 2007, the special committee recommended the merger at that price and the Board of Directors unanimously approved the recommendation. The special committee had never solicited other bidders or attempted to auction Golden, and it had received notice from Altimo that Altimo would not consent to any acquisition by any bidder other than VimpelCom. On December 20, Credit Suisse delivered a fairness opinion in support of the $105 per share price. Golden distributed that fairness opinion, along with Golden's business plan, to all shareholders. The companies signed a Merger Agreement on December 21, 2007, which called for a cash tender offer for all the outstanding shares of Golden's common stock and a backend merger in which all shares not tendered were converted into the right to receive the same amount per share in cash.

Ultimately, shareholders tendered 94.4% of Golden's shares before the tender offer expired, and another 2.2% accepted the $105 per share price shortly thereafter. Global, however, declined to tender their shares, and opted for an appraisal remedy under Delaware General Corporate Law Section 262(h). On April 23, 2010, the Court of Chancery issued an opinion in the appraisal proceeding that the fair value of Golden as of the merger date was $125.49 per share, and it awarded Global a judgment accordingly.

Golden now appeals the judgment. First, Golden argues that the Court of Chancery erred by failing to defer to the merger price. Supported by the arms-length nature of the merger and the efficient market price, Golden contends that the merger price indicated Golden's fair value for purposes of appraisal. In so contending, Golden requests that this Court adopt a standard requiring conclusive or, in the alternative, presumptive deference to the merger price in an appraisal proceeding. Second, Golden objects to the Court of Chancery's valuation. Specifically, Golden argues that the Vice Chancellor abused his discretion by giving no weight to the market evidence and by making factual findings unsupported by the record. Golden also contends that the Vice Chancellor erred as a matter of law and abused his discretion by considering a blended beta, accepting Global's expert's proffered Equity Risk Premium, and accepting Global's expert's proffered long term growth rate in its discounted cash flow calculation.

Global contests all of Golden's contentions and crossappeals the Court of Chancery's judgment. Specifically, Global contends that the Vice Chancellor erred by using the incorrect tax rate and by failing to consider the Barra beta.

## II. ANALYSIS

Our review is *de novo* to the extent a trial court decision implicates the

statutory construction of DGCL § 262.[1] We use an abuse of discretion standard and grant significant deference when we review factual findings in a statutory appraisal proceeding.[2]

### A. There Is No Basis For a Court, In a Statutory Appraisal Proceeding, To Conclusively, Or Even Presumptively, Defer To a Merger Price As Indicative Of "Fair Value."

■ In an appraisal proceeding, the Court of Chancery "shall determine the fair value of the shares ... together with interest, if any, to be paid upon the amount determined to be the fair value."[3] Section 262(h) neither dictates nor even contemplates that the Court of Chancery should consider the transactional market price of the underlying company. Rather, in determining "fair value," the statute instructs that the court "shall take into account all relevant factors."[4] Importantly, this Court has defined "fair value" as the value to a stockholder of the firm as a going concern, as opposed to the firm's value in the context of an acquisition or other transaction.[5] Determining "fair value" through "all relevant factors" may be an imperfect process, but the General Assembly has determined it to be an appropriately fair process. Section 262(h) controls appraisal proceedings, and there is little room for this Court to graft common law gloss on the statute even if we were so inclined.

■ Section 262(h) unambiguously calls upon the Court of Chancery to perform an *independent* evaluation of "fair value" at the time of a transaction. It vests the Chancellor and Vice Chancellors with sig-

1. *M.P.M. Enters., Inc. v. Gilbert*, 731 A.2d 790, 795 (Del.1999).

2. *Id.*

3. 8 *Del. C.* § 262(h).
   (h) After the Court determines the stockholders entitled to an appraisal, the appraisal proceeding shall be conducted in accordance with the rules of the Court of Chancery, including any rules specifically governing appraisal proceedings. Through such proceeding the Court shall determine the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation, together with interest, if any, to be paid upon the amount determined to be the fair value. In determining such fair value, the Court shall take into account all relevant factors. Unless the Court in its discretion determines otherwise for good cause shown, interest from the effective date of the merger through the date of payment of the judgment shall be compounded quarterly and shall accrue at 5% over the Federal Reserve discount rate (including any surcharge) as established from time to time during the period between the effective date of the merger and the date of payment of the judgment. Upon application by the surviving or resulting corporation or by any stockholder entitled to participate in the appraisal proceeding, the Court may, in its discretion, proceed to trial upon the appraisal prior to the final determination of the stockholders entitled to an appraisal. Any stockholder whose name appears on the list filed by the surviving or resulting corporation pursuant to subsection (f) of this section and who has submitted such stockholder's certificates of stock to the Register in Chancery, if such is required, may participate fully in all proceedings until it is finally determined that such stockholder is not entitled to appraisal rights under this section.

4. *Id.*

5. *Gilbert*, 731 A.2d at 795 ("Fair value, as used in § 262(h), is more properly described as the value of the company to the stockholder as a going concern, rather than its value to a third party as an acquisition. We have long recognized that failure to value a company as a going concern may result in an understatement of fair value.") (citing *Gonsalves v. Straight Arrow Pubs., Inc.*, 701 A.2d 357, 362 (1997); *Cede & Co. v. Technicolor*, 684 A.2d 289, 289 (1996); *Baron v. Pressed Metals of Am., Inc.*, 123 A.2d 848, 854 (1956)).

nificant discretion to consider "all relevant factors" and determine the going concern value of the underlying company. Requiring the Court of Chancery to defer—conclusively or presumptively—to the merger price, even in the face of a pristine, unchallenged transactional process, would contravene the unambiguous language of the statute and the reasoned holdings of our precedent. It would inappropriately shift the responsibility to determine "fair value" from the court to the private parties. Also, while it is difficult for the Chancellor and Vice Chancellors to assess wildly divergent expert opinions regarding value, inflexible rules governing appraisal provide little additional benefit in determining "fair value" because of the already high costs of appraisal actions. Appraisal is, by design, a flexible process. Therefore, we reject Golden's contention that the Vice Chancellor erred by insufficiently deferring to the merger price, and we reject its call to establish a rule requiring the Court of Chancery to defer to the merger price in any appraisal proceeding.

## B. *We Decline To Adopt a Bright Line Rule That a Company, In An Appraisal Proceeding, Is Bound By Company–Specific Data It Has Previously Sent To Its Stockholders.*

■ On crossappeal, Global argues that Golden should not have been allowed to disavow the tax rate set forth in the fairness opinion it distributed to its stockholders—an opinion procured by Golden and prepared by Golden's financial advisor using Golden's input, assistance, and approval. Global is correct that "[s]tockholders are entitled to rely upon the truthfulness of all information disseminated to them." [6]

Global is also correct that the "primary purpose of [ ] fairness opinion[s] . . . [i]s to convince the stockholders to whom the tender offer [i]s to be made that the price offered [i]s fair." [7] Global argues on that basis that prohibiting public companies from walking away from their own company specific data previously provided to stockholders reemphasizes the important role of the duty of candor in Delaware's corporation law and supports the goal of an accurate determination of "fair value" in appraisal.

■ We decline to adopt a rule that binds public companies to previously prepared company specific data in appraisal proceedings. First, as we stated above, appraisal is, by design, a flexible process. The statute gives the Chancellor and Vice Chancellors significant discretion, and the adoption of strict rules to govern the process, as a general matter, likely would increase the price of an already expensive proceeding. Second, Section 262(h) controls, it is unambiguous, and it nowhere requires the appraising authority to require the parties to adhere to previously prepared data. Rather, it vests the court with significant discretion to consider "all relevant factors." [8] Third, public companies distribute data to their stockholders to convince them that a tender offer price is "fair." In the context of a merger, this "fair" price accounts for various transactional factors, such as synergies between the companies. Requiring public companies to stick to transactional data in an appraisal proceeding would pay short shrift to the difference between valuation at the tender offer stage—seeking "fair price" under the circumstances of the

---

**6.** *Malone v. Brincat,* 722 A.2d 5, 10 (Del. 1998).

**7.** *Joseph v. Shell Oil Co.,* 482 A.2d 335, 341 (Del.Ch.1984).

**8.** *See* § 262(h).

transaction—and valuation at the appraisal stage—seeking "fair value" as a going concern.[9] Finally, to the extent that allowing a public company to advocate different data at the tender offer and appraisal stages of a transaction implicates concerns about director abuse of the system, shareholders remain protected by fiduciary duties and their right to complain and recover for fiduciary misconduct.

We expect many companies will advocate the same company specific data in appraisal proceedings that they have previously advocated in proxy materials. Delaware law does not require them to do so, however. Instead, we recognize that the Chancellor and Vice Chancellors can—and generally should—consider and weigh inconsistencies in data advocated by a company. Here, the Vice Chancellor had a rational basis for accepting Golden's proffered tax rate, albeit different than the tax rate in its proxy statement.

### C. *The Vice Chancellor Did Not Abuse His Discretion In His Valuation.*

The Court of Chancery abuses its discretion only when either its factual findings do not have record support or its valuation is clearly wrong.[10] This is a formidable standard and we accord Court of Chancery determinations of value a high level of deference on appeal.[11] We defer because, over time, the Court of Chancery "has developed an expertise in cases of this type." [12] In addition, while discharging its statutory mandate, it is entirely proper for the Court of Chancery to adopt one expert's model, methodology, and calculations if they are supported by credible evidence and the judge analyzes them crit-

ically on the record.[13] As long as they are supported by the record, we will defer to the Court of Chancery's factual findings even if we might independently reach a different conclusion.[14]

Against this background of deference, we find that the record supports the Vice Chancellor's findings of fact and valuation methods. In his opinion, he addressed each of these findings of fact and valuation methods, and he followed an orderly and logical deductive process in arriving at his conclusions with respect to the factual issues disputed on this appeal. The record supports his conclusions and he did not abuse his discretion.

### III. CONCLUSION

The Vice Chancellor did not err by failing to defer to the deal price when conducting his appraisal valuation, and we decline to adopt a rule that the Chancellor or Vice Chancellors must defer conclusively or presumptively to the deal price as indicative of fair value in an appraisal proceeding. Also, the Vice Chancellor did not err by accepting Golden's proffered tax rate, which was different than the tax rate it advocated in its proxy materials, and we decline to adopt a rule binding public companies in appraisal proceedings to previously disseminated company specific data. Finally, the Vice Chancellor did not abuse his discretion in his valuation.

The judgment of the Court of Chancery is affirmed.

---

9. *See Gilbert,* 731 A.2d at 795.

10. *M.G. Bancorp., Inc. v. Le Beau,* 737 A.2d 513, 526 (1999).

11. *Id.*

12. *In re Appraisal of Shell Oil Co.,* 607 A.2d 1213, 1219 (1992).

13. *M.G. Bancorp.,* 737 A.2d at 526.

14. *Cede & Co. v. Technicolor, Inc.,* 884 A.2d 26, 35 (2005).