# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MERLIN PARTNERS LP, and                  :
AAMAF, LP,                               :
                                         :
                  Petitioners,           :
                                         :
        v.                               :     **C.A. No. 8509-VCN**
                                         :
AUTOINFO, INC., a Delaware               :
corporation,                             :
                  Respondent.            :

# MEMORANDUM OPINION

Date Submitted: January 9, 2015
Date Decided: April 30, 2015

Ronald A. Brown, Jr., Esquire, Marcus E. Montejo, Esquire, Kevin H. Davenport, Esquire, and Eric J. Juray, Esquire of Prickett, Jones & Elliott, P.A., Wilmington, Delaware, Attorneys for Petitioners.

A. Thompson Bayliss, Esquire and David A. Seal, Esquire of Abrams & Bayliss LLP, Wilmington, Delaware, Attorneys for Respondent.

NOBLE, Vice Chancellor.

Petitioners Merlin Partners LP and AAMAF, LP are former common stockholders of Respondent AutoInfo, Inc. ("AutoInfo" or the "Company"). Pursuant to 8 *Del. C.* § 262, they demanded appraisal of their shares in connection with a merger (the "Merger") whereby AutoInfo's common stockholders were cashed out at a price of $1.05 per share. This memorandum opinion sets forth the Court's post-trial findings of fact and conclusions of law.

## I. BACKGROUND

A. *AutoInfo's Business*

At the time of the Merger, AutoInfo was a public non-asset based transportation services company operating through two wholly-owned subsidiaries.[1] It did not own any equipment and provided brokerage and contract carrier services through a network of independent sales agents in the United States and Canada. AutoInfo and its agents split fees generated by freight transportation transactions.[2] The agents developed and maintained all important client relationships.[3]

The Company also provided support services to its agents. Its assistance was primarily financial, such as making long-term loans and short-term advances.

---

[1] This memorandum opinion does not distinguish between AutoInfo and its subsidiaries; they are collectively referred to as AutoInfo.
[2] Trial Tr. 145 (Puglisi).
[3] Trial Tr. 34 (Patterson).

1

AutoInfo also supplied non-financial services, such as training, marketing assistance, market segment data, and business analysis tools.[4]

The Company's 100% agent-based model distinguished it from many others in the transportation logistics industry that rely on a "company store" model. While AutoInfo's brokers were independent contractors, "[b]rokers [in a company store model] are direct employees of the company."[5]

B. *AutoInfo's Board and Management*

AutoInfo's management (the "Management") consisted of Harry Wachtel ("Wachtel"), the Chairman and Chief Executive Officer ("CEO"); Michael Williams ("Williams"), the President, Chief Operating Officer, and General Counsel; William I. Wunderlich ("Wunderlich"), an Executive Vice President and the Chief Financial Officer ("CFO"); Mark Weiss ("Weiss"), an Executive Vice President; and David Less, the Chief Information Officer and Vice President.

Throughout the sales process, and at the time of the Merger, AutoInfo's board (the "Board") consisted of five directors. Two, Wachtel and Weiss, were inside directors. The others, Peter Einselen, Thomas C. Robertson, and Mark K. Patterson ("Patterson"), were outside directors. Wachtel served as the Board's chairman.[6]

---

[4] JX 335 ("AutoInfo 2012 Form 10-K") at 2.
[5] JX 179 ("L.E.K. Consulting Due Diligence Presentation") at 32.
[6] AutoInfo 2012 Form 10-K at 28.

2

C. *The Merger*

1. AutoInfo Considers Strategic Alternatives

During a regularly scheduled meeting in the first quarter of 2011, the Board discussed AutoInfo's financial results, budget, business, and financial prospects. It was concerned that the market undervalued AutoInfo relative to comparable agent-based, non-asset based transportation services companies. Part of the problem was that the Company was small, thinly traded on the Nasdaq Over-the-Counter Bulletin Board, and did not receive much analyst coverage. The Board decided that exploring strategic options, including a potential sale, was in the best interests of AutoInfo's stockholders.[7]

The Board was not the only AutoInfo constituent disappointed with the Company's stock price. Around this time, Patterson (a Board member) was contacted by Kinderhook, LP ("Kinderhook"), a stockholder with which he had a relationship.[8] Kinderhook believed that AutoInfo's stock price failed to reflect its financial performance. Although it did not push for a sale of the Company, it encouraged the Board to develop a strategy to increase the stagnant stock price, which was then trading in the $0.50-0.60 per share range.[9]

---

[7] JX 334 ("Apr. 1, 2013, AutoInfo Schedule 14A") at 23.
[8] Trial Tr. 7 (Patterson). Kinderhook controlled 6,278,312 AutoInfo shares, representing approximately 18.3% of the Company's outstanding common shares. JX 336 ("Apr. 1, 2013, AutoInfo Form DEFM14A") at 72.
[9] Trial Tr. 12, 23-24 (Patterson).

2. <u>AutoInfo Retains Stephens</u>

In summer 2011, Patterson contacted Stephens Inc. ("Stephens"), an investment bank with experience in the transportation industry, to explore AutoInfo's strategic options. Stephens prepared and presented on July 29, 2011, a Strategic Initiatives Overview, outlining avenues for enhancing stockholder value.[10] While AutoInfo had "built a solid legacy within the transportation and logistics industry," it "consistently traded at valuation multiples well below its peer group due to the Company's relatively small scale and corresponding lack of interest from the investment community."[11] Stephens believed that if the Company could grow its market capitalization from $20 million to approximately $400-500 million, then it would gain greater Wall Street attention and access capital at a lower cost.[12] The investment bank concluded that AutoInfo might need to alter its strategy to achieve the necessary growth.[13]

Stephens thus proposed strategic alternatives, including organic projects, shareholder distributions, and acquisitions.[14] It identified pros and cons for each option. For example, it suggested that "[e]xecution risk," related to Management's ability to execute, would be a concern should the Company decide to pursue an

---

[10] JX 19 ("Stephens's Strategic Initiatives Overview").
[11] *Id.* at 5.
[12] Trial Tr. 276-77 (Miller); Stephens's Strategic Initiatives Overview 12.
[13] Stephens's Strategic Initiatives Overview 5.
[14] *Id.* at 14.

organic project.[15] Stephens also preliminarily valued the Company within a range of $0.59 to $1.76 per share.[16] The average of its valuations was $0.98 per share, above the Company's then-current $0.60 price.[17]

In August 2011, after considering its various options, the Board began reaching out to potential purchasers.[18] Patterson contacted parties that were active in mergers and acquisitions in the transportation industry. While there was some interest, AutoInfo could not reach a satisfactory agreement.[19]

Several months later, in November 2011, activist hedge funds Baker Street Capital L.P. and Khrom Capital Management, through affiliated entities ("Baker Street"), acquired a 13% equity interest in AutoInfo.[20] Baker Street began expressing its desire that AutoInfo be sold. According to Patterson, those demands did not impact the Board's sales process, which was already underway.[21]

In early 2012, after interviewing several investment banks, AutoInfo formally retained Stephens to run a sales process.[22] The parties agreed to an incentive-based fee structure whereby Stephens would be paid 2% on the first $54

---

[15] *Id.* at 15; Trial Tr. 16 (Patterson).
[16] Stephens's Strategic Initiatives Overview 19.
[17] *Id.*
[18] Trial Tr. 17 (Patterson).
[19] Trial Tr. 19 (Patterson).
[20] JX 23 (Baker Street November 10, 2011, Schedule 13D); JX 86 (Baker Street Apr. 20, 2012, Schedule 13D, Amendment No. 1).
[21] Trial Tr. 20 (Patterson).
[22] Trial Tr. 25 (Patterson).

million of a transaction price and 5% on any additional value.[23]  Stephens had extensive industry experience; Michael Miller ("Miller"), who worked on AutoInfo's engagement, had focused on the transportation logistics space since 2002.[24]

### 3. Management's Financial Projections

To implement the sales process, Stephens asked Management to prepare a bottoms-up five-year financial forecast (the "Management Projections").[25] Stephens specified that because they would be used to market the Company, the projections should be optimistic.[26]  Management had never prepared multi-year projections before and its first attempt fell largely on Wunderlich's (its CFO) shoulders.[27]  Internally, Management doubted its ability to forecast the Company's future performance accurately and perceived its attempt as "a bit of a chuckle and a joke."[28]  It questioned how to go about a process it had never before attempted.[29]

Recognizing that the Management Projections would be used to shop the Company, Wunderlich focused on painting an "aggressively optimistic" picture.[30]

---

[23] Trial Tr. 280 (Miller).
[24] Trial Tr. 274 (Miller).
[25] Trial Tr. 281 (Miller).
[26] *Id.*
[27] Trial Tr. 481-82 (Wachtel).
[28] Williams Dep. 170.
[29] Trial Tr. 354 (Williams).
[30] Wunderlich Dep. 49.  *See also* Caple Dep. 38 ("[The Management Projections were] about the most optimistic you could make them."); Trial Tr. 237 (Puglisi)

Williams, AutoInfo's President, helped develop the forecast by projecting agent revenue.[31]   He started with each agent's historical revenue and "took the most optimistic view of [the] agents' performance in the marketplace . . . ."[32]   He categorized agents by size and assumed that larger agents would grow at a lower percentage than smaller agents."[33]   Williams testified that there "was no science" behind those assumptions.[34]   He also looked at agent-by-agent historical results and predicted, based on knowledge of the individual agents, how much the agent's business could grow during 2012-2013.[35]   Those growth assumptions were extrapolated to later years.[36]   The Management Projections also included estimates of how successfully the Company would recruit new agents.[37]

---

("They were optimistic.  I didn't see anybody who said they weren't optimistic."); Trial Tr. 359 (Williams) ("Overly optimistic, really to the exclusion of external and internal risk factors that otherwise are part of the business."); Trial Tr. 399 (Williams) ("[W]e prepared those projections with the most optimistic view of the future that we could possible conceive.").

[31] Williams Dep. 168-70.  Weiss and AutoInfo's director of corporate marketing and communications assisted this effort.  Trial Tr. 395 (Williams).

[32] Trial Tr. 396 (Williams).

[33] Williams Dep. 175.

[34] *Id.*

[35] *Id.* at 169.

[36] *Id.* at 169-70.

[37] *Id.* at 168.

4. Comvest Emerges as the Highest Bidder

In the spring of 2012, Stephens contacted 164 potential strategic and financial acquirers, focusing on those most interested in the transportation space.[38] Approximately seventy bidders signed non-disclosure agreements ("NDAs") and received a Confidential Information Memorandum ("CIM").[39] Those interested were provided several weeks for due diligence before a deadline to submit an indication of interest ("IOI").[40] By the end of May, ten bidders had presented IOIs, with bids ranging from $0.90-$1.36 per share.[41] Nine moved on to a second round of the sales process, at which point they attended Management presentations and received access to an electronic data room.[42]

On June 28, 2012, the Board formed a special committee (the "Special Committee") to evaluate the competing offers. The Special Committee consisted

---

[38] Trial Tr. 33 (Patterson); Trial Tr. 282-83 (Miller). The Board opted against publicly announcing a sales process because it did not want to disrupt its agent base. The possibility of losing agents is particularly troublesome for a 100% agent-based company because the agents maintain all client relationships. Trial Tr. 33-34 (Patterson). If a public announcement caused agents to leave the company, then AutoInfo would not likely have maintained its revenue and earnings. Trial Tr. 34 (Patterson).

[39] Trial Tr. 285 (Miller).

[40] *Id.*

[41] JX 295 ("Stephens's Special Committee Presentation") at 9.

[42] *Id.* The one party that did not advance to the next round had provided the lowest IOI. Trial Tr. 287 (Miller).

of the three outside directors, with Patterson serving as chair.[43] It proceeded, with the assistance of a legal advisor and a financial advisor, to review the bids.[44]

By July, three would-be acquirers had submitted written letters of intent ("LOI") and two others had presented verbal valuation ranges.[45] After receiving legal advice regarding its fiduciary duties, the Special Committee weighed the proposals as against each other and the alternative option of foregoing a sale at that time.[46] It decided to continue with the sales process and instructed Stephens to negotiate with the bidders over price.[47]

Later that month, Stephens updated the Special Committee with final terms for the written bids. HIG Capital ("HIG") had made the highest offer at $1.30 per share.[48] The Special Committee determined that the highest offer was also the best and recommended that the Board pursue a transaction with HIG. The Board accepted this determination and on August 14, 2012, executed an LOI at the $1.30

---

[43] JX 114 (June 28, 2012, Board minutes).

[44] Patterson Dep. 102-03.

[45] Stephens's Special Committee Presentation 9. Comvest Partners was one of the bidders which expressed verbal interest with the caveat that it would need additional time for due diligence because of conflicts with other transactions. JX 117 (Stephens's July 2, 2012, Process Update) at 4.

[46] Apr. 1, 2013, AutoInfo Schedule 14A at 26.

[47] *Id.* at 26-27.

[48] Stephens's Special Committee Presentation 9.

per share price, which provided for a forty-five day exclusivity period to negotiate and perform further due diligence.[49]

HIG conducted due diligence for the next thirty days but by mid-September, it decided not to proceed with the purchase.[50] HIG's lead partner on the deal had left the firm, apparently due to various disagreements with his colleagues, including whether HIG should decrease its offer for AutoInfo.[51] After that partner's departure, HIG opted against pursuing AutoInfo.[52] The parties terminated their LOI, and AutoInfo decided to continue with the sales process. Stephens contacted previously interested parties, as well as others it recommended to AutoInfo.[53]

By October 2012, two interested parties had submitted written LOIs and two others had indicated interest verbally. The highest offer came from Comvest Partners ("Comvest") and valued the Company at $1.26 per share.[54] The others were substantially lower, ranging from $1.00-$1.07 per share.[55] After determining that Comvest's offer was the best, the Special Committee recommended that the Board pursue that transaction. The Board unanimously agreed and on

---

[49] Apr. 1, 2013, AutoInfo Schedule 14A at 27.
[50] *Id.*
[51] Trial Tr. 290 (Miller).
[52] *Id.*
[53] *Id.*
[54] Stephens's Special Committee Presentation 9.
[55] *Id.*

November 12, 2012, AutoInfo executed an LOI with Comvest at $1.26 per share with a thirty day exclusivity period.[56] Comvest then hired accounting, legal, industry, and other advisors to conduct due diligence.[57]

### 5. Comvest's Due Diligence Process

Comvest hired L.E.K. Consulting ("LEK"), a strategy consultant, to assess AutoInfo's competitive positioning in the trucking freight brokerage market.[58] LEK evaluated growth trends and dynamics in the brokerage market generally, as well as concerns associated with AutoInfo's agent-based business.[59] Comvest considered LEK's findings as very positive.[60]

LEK's analysis came relatively early in the due diligence process, and as that process evolved, Comvest learned of potential issues associated with AutoInfo's business.[61] For example, AutoInfo's infrastructure for recruiting new agents, which represented the lifeblood of the Company, was lacking.[62] Comvest determined that it would need to address that deficiency, and others, before it could

---

[56] *Id.*
[57] *Id.*
[58] L.E.K. Consulting Due Diligence Presentation 3.
[59] Trial Tr. 445 (Caple).
[60] Trial Tr. 446 (Caple).
[61] *Id.*
[62] *Id.*

11

effectively recruit agents and grow AutoInfo's business.[63] Its biggest concerns, however, arose during its accounting due diligence.

Comvest retained McGladrey LLP ("McGladrey") to perform financial due diligence; its work included conducting a quality of earnings analysis to test the accuracy of the Company's stated historical earnings and its ability to achieve projections.[64] McGladrey began its review in November 2012, with Wunderlich, AutoInfo's CFO, serving as its primary Company contact. McGladrey was immediately taken aback by the poor quality of AutoInfo's financial records, which were unusually bad for a publicly traded company.[65] The state of the financials caused the due diligence process to be more difficult than McGladrey had anticipated.[66]

McGladrey was surprised that AutoInfo used QuickBooks, accounting software popular among small businesses, but rarely employed by public companies.[67] Also troubling to McGladrey was the fact that a Florida-based public company would engage a one-office, Connecticut-based accounting firm as its outside auditor.[68] More importantly, McGladrey believed that some of AutoInfo's

---

[63] Trial Tr. 447 (Caple).
[64] Trial Tr. 405, 408 (Spizman).
[65] Trial Tr. 412 (Spizman); JX 159 (emails among McGladrey personnel).
[66] Trial Tr. 414 (Spizman); JX 159. McGladrey also considered Wunderlich to be "in over his head" as a public company CFO. Trial Tr. 424 (Spizman).
[67] Trial Tr. 414-15 (Spizman).
[68] Trial Tr. 415 (Spizman).

accounting practices violated generally accepted accounting principles.[69] McGladrey raised these concerns with an increasingly troubled Comvest.[70]

In December 2012, McGladrey reported its findings to Comvest (the "McGladrey Report").[71] AutoInfo's Management had estimated the Company's 2012 adjusted EBITDA as $10 million.[72] McGladrey concluded that $7.7 million was an appropriate estimate, representing a 23% reduction.[73] Comvest considered the McGladrey Report a "huge problem" with the potential to "blow[] up" the deal.[74] Not only was AutoInfo's EBITDA apparently much lower than initially assumed, but there was "a whole series of weaknesses in the company's financial reporting practices . . . ."[75]

AutoInfo responded to the McGladrey Report through a memorandum prepared by Wunderlich.[76] McGladrey considered the rebuttal unconvincing.[77] At the beginning of January, Wunderlich, Wachtel, and a representative from Stephens met with a Comvest representative to discuss the McGladrey Report and

---

[69] Spizman Dep. 65-66.
[70] Trial Tr. 417 (Spizman).
[71] JX 223.
[72] Trial Tr. 418-19 (Spizman).
[73] Trial Tr. 419 (Spizman).
[74] Trial Tr. 453 (Caple).
[75] Caple Dep. 116.
[76] JX 208; Trial Tr. 419-20 (Spizman).
[77] Trial Tr. 420 (Spizman).

13

AutoInfo's response.[78] While Comvest listened to AutoInfo's arguments, it remained convinced that the McGladrey Report raised valid issues and McGladrey did not change its conclusions.

After that meeting, Comvest lowered its offer to $0.96 per share and AutoInfo countered at $1.15.[79] During ensuing negotiations, Comvest learned that AutoInfo had guaranteed some loans, the existence of which had been undisclosed and unreported. Some of the borrower's creditors had filed an involuntary bankruptcy petition and AutoInfo was facing the possibility of having to satisfy the guarantees.[80] Comvest was concerned not only by AutoInfo's increased liabilities, but more importantly, it was troubled by the fact that the guarantees had not been properly identified in the first place.[81] Its confidence in the quality of AutoInfo's financial information and controls further deteriorated.[82]

On January 18, 2013, the Special Committee and Comvest agreed to a new price of $1.06 per share.[83] Comvest had successfully negotiated for Wachtel (AutoInfo's CEO) to roll over $500,000 and for Weiss (another executive) to roll

---

[78] JX 211 (email from Wachtel to Patterson regarding Comvest meeting).
[79] Trial Tr. 294 (Miller).
[80] JX 231 (memo to Special Committee).
[81] Trial Tr. 460 (Caple).
[82] Caple Dep. 176-77.
[83] JX 236 (emails among Comvest employees).

over 25% of his deal proceeds.[84]  The deal process then resumed, until discovery of another accounting deficiency.  AutoInfo had improperly booked a transaction, worth approximately $1,000,000 in EBITDA, in the third quarter of 2012 before the deal had closed.[85]  Comvest was shocked at this revelation and was worried that AutoInfo would need to restate its financials.  Characterizing his reaction, John Caple, Comvest's lead partner on the AutoInfo deal, testified, "As much as I had seen financial weaknesses in the business, the fact that the company could book a million dollar transaction that hadn't actually happened, I've just never seen that before in any business I've worked with, public or private."[86]  AutoInfo determined, after an approximately two week review, that its financials would not need to be restated.[87]  Nonetheless, Comvest was "disturb[ed that the error] could have happened at all, particularly given the size and the impact of the transaction."[88]  Comvest's already low confidence in AutoInfo's Management and internal controls eroded further and it revised its offer to $1.00 per share.[89]

---

[84] *Id.*  Comvest demanded the rollover agreements as a condition to executing at $1.06 so that Management would retain an economic stake in AutoInfo's business moving forward.  Trial Tr. 458-59 (Caple).

[85] Trial Tr. 460 (Caple).

[86] *Id.*

[87] Trial Tr. 461 (Caple).  "The auditors determined that because the transaction could be closed now that it was simply . . . sort of a paperwork error."  *Id.*

[88] *Id.*

[89] *Id.*

On February 28, 2013, after additional negotiations, the parties ultimately reached an agreement at $1.05 per share, with Wachtel entering into an indemnification agreement for potential breaches of AutoInfo's representations and warranties, whereby $500,000 of his proceeds would be held in escrow.[90] The Board approved the Merger pursuant to the Special Committee's unanimous recommendation. Stephens had provided a fairness opinion and presentation to the Special Committee. AutoInfo announced the Merger on March 1, 2013.[91]

On April 25, 2013, AutoInfo's stockholders approved the deal and the transaction closed later that day. No topping bids had emerged between the deal's announcement and closing.[92]

## II. THE PARTIES' COMPETING VALUATIONS

Both parties retained well-qualified experts to opine on the fair value of Petitioners' stock as of the date of the Merger. Petitioners' expert, Donald Puglisi ("Puglisi"), suggests that AutoInfo's fair value was $2.60 per share. He places equal weight on three valuation calculations: a discounted cash flow ("DCF")

---

[90] Trial Tr. 462 (Caple); Apr. 1, 2013, AutoInfo Form DEFM14A at 5. Wachtel, Williams, and Weiss entered a rollover agreement whereby they acquired an indirect ownership interest in AutoInfo upon the closing of the Merger. Wachtel and Williams also entered into new employment agreements with AutoInfo. *Id.*
[91] JX 302.
[92] This was despite at least one stockholder's attempts to solicit topping bids. *See, e.g.*, JX 309; JX 314; JX 318.

analysis, and two comparable companies analyses, one using a historical based multiple and the other a forward looking multiple.[93]

AutoInfo's expert, Mark Zmijewski ("Zmijewski"), submits that AutoInfo's fair value on the date of the Merger was $0.967 per share. Unlike Puglisi, Zmijewski does not believe that a DCF or comparable companies analysis can be reliably performed with available data. Instead, he analyzed the Merger price and the market evidence regarding the strength of AutoInfo's sales process. He concluded that the Merger price, minus cost savings arising from the Merger, is the best available evidence of the Company's fair value on the Merger date.[94]

## III. ANALYSIS

### A. *The Appraisal Statute*

Under 8 *Del. C.* § 262, stockholders who elect against participating in certain merger transactions may petition the Court to determine the fair value of their stock.[95] Assuming all procedural requirements are satisfied, the Court

> determine[s] the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation, together with interest, if any, to be paid upon the

---

[93] JX 380 ("Puglisi Opening Report").

[94] JX 381 ("Zmijewski Opening Report"). Zmijewski did conduct a DCF analysis, for illustrative purposes, for his rebuttal expert report. *See* JX 415 ("Zmijewski Rebuttal Report") at 22. That did not affect his fair value conclusion.

[95] 8 *Del. C.* § 262.

amount determined to be the fair value. In determining such fair value, the Court . . . take[s] into account all relevant factors.[96]

"Fair value" represents "the value to a stockholder of the firm as a going concern, as opposed to the firm's value in the context of an acquisition or other transaction."[97] To discharge its statutory responsibility, the Court independently evaluates the evidence concerning fair value and does not presumptively defer to any particular valuation metric.[98] The Court may consider "any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court . . . ."[99] Depending on the case, a DCF analysis, a comparable transactions analysis, a comparable companies analysis, or the merger price itself may inform the Court's determination.[100] "[A]n arms-length merger price resulting from an effective market check" is a strong indicator of actual value.[101]

In a Section 262 appraisal proceeding, "both sides have the burden of proving their respective valuation positions by a preponderance of the evidence."[102]

---

[96] 8 *Del. C.* § 262(h). There is no dispute that Petitioners have met all procedural requirements.

[97] *Golden Telecom, Inc. v. Global GT LP*, 11 A.3d 214, 217 (Del. 2010).

[98] *Id.* at 217-18.

[99] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 713 (Del. 1983).

[100] *Huff Fund Inv. P'ship v. CKx, Inc.*, 2013 WL 5878807, at *9 (Del. Ch. Nov. 1, 2013), *aff'd*, -- A.3d --, 2015 WL 631586 (Del. Feb. 12, 2015) ("*Huff*").

[101] *Global GT LP v. Golden Telecom, Inc.*, 993 A.2d 497, 507 (Del. Ch. 2010), *aff'd*, 11 A.3d 214 (Del. 2010).

[102] *M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 520 (Del. 1999).

The Court may select one of the parties' valuation models, make adjustments to a proffered model, or fashion its own framework.[103]

## B. *Puglisi's DCF Analysis*

Puglisi bases his valuation of AutoInfo in part on a DCF analysis. "DCF, in theory, is not a difficult calculation to make—five-year cash flow projections combined with a terminal value are discounted to their present value to produce an overall enterprise value."[104] However, when reliable inputs are unavailable, "any values generated by a DCF analysis are meaningless."[105] Puglisi used the Management Projections in his DCF calculation. The first question is: are those projections reliable?[106]

The Court will often give weight to management projections made in the regular course of business because "management ordinarily has the best first-hand knowledge of a company's operations."[107] Nonetheless, "management projections [may be disregarded] where the company's use of such projections was unprecedented, where the projections were created in anticipation of litigation, or where the projections were created for the purpose of obtaining benefits outside the

---

[103] *Cede & Co. v. Technicolor, Inc.*, 684 A.2d 289, 299 (Del. 1996).

[104] *Huff*, 2013 WL 5878807, at *9.

[105] *Id.*

[106] That the projections were not ultimately realized does not foreclose the potential conclusion that they were reliable as of their preparation date.

[107] *Doft & Co. v. Travelocity.com Inc.*, 2004 WL 1152338, at *5 (Del. Ch. May 20, 2004).

company's ordinary course of business."[108]   If management had never prepared projections beyond the current fiscal year, the Court may be skeptical of its first attempt.[109]

Here, Petitioners have failed to establish that the Management Projections can be relied upon.[110]   Management prepared them at Stephens's request and with the guidance that they "need[ed] to be optimistic" to maximize the effort to market the Company.[111]   Management had never prepared anything resembling the Management Projections before and "hadn't analyzed the business historically in a way that would allow [it] to predict the future."[112]   Stephens had advised, "You're trying to sell the business.  You need to paint the most optimistic and bright current and future condition of the company that you can.  All positive.  Let's get the most interest by painting the most positive picture of this business."[113]

---

[108] *Huff*, 2013 WL 5878807, at *9.

[109] *Merion Capital, L.P. v. 3M Cogent, Inc.*, 2013 WL 3793896, at *11 (Del. Ch. July 8, 2013) (citing *Gearreald v. Just Care, Inc.*, 2012 WL 1569818, at *4 (Del. Ch. Apr. 30, 2012)).

[110] AutoInfo's expert agrees that "the Management Projections are not a reliable forecast of the Company's expected future performance and, thus, would not yield a reliable indication of the Fair Value of AutoInfo common stock."  Zmijewski Opening Report ¶ 53.

[111] Trial Tr. 281-82 (Miller).

[112] Trial Tr. 354 (Williams).

[113] Trial Tr. 355 (Williams).

As discussed in Section I.C.3 above, the Management Projections were indisputably optimistic.[114] Puglisi, Petitioners' own expert, testified that he would have implied a discount factor to back out the optimism if the record had provided a basis for calculating one.[115] Even if Management had not been motivated to paint a bright picture, its projections would have been unreliable. Again, Management itself had no confidence in its ability to forecast.[116] If Management could not have been trusted to produce credible projections in the ordinary course of business, the projections it created during the sales process deserve little deference. Because Petitioners have failed to establish the credibility of a key component in their expert's DCF analysis, the Court gives that analysis no weight.[117]

## C. *Puglisi's Comparable Companies Analyses*

Puglisi performed two comparable companies analyses, one using a 2012 EBITDA figure derived from AutoInfo's 2012 10-K, and the other using an estimated 2013 EBITDA created by modifying the Management Projections. To perform a comparable companies analysis, one must first identify a set of actively traded public companies sharing similar business characteristics with the subject

---

[114] *See supra* note 30.
[115] Trial Tr. 237 (Puglisi).
[116] *See supra* text accompanying note 28 (describing the Management Projections as "a bit of a chuckle and a joke").
[117] This conclusion is corroborated by the dramatic difference between Puglisi's DCF value and the Merger price. As discussed below, the Merger price, unlike Puglisi's DCF output, is indicative of fair value.

company. Using available information, one then derives a valuation multiple that, when multiplied by a relevant financial performance metric, such as EBITDA, provides an estimate of the value of a company as a whole.

The Court may credit a comparable companies analysis in an appraisal proceeding; however, "[t]he utility of the comparable company approach depends on the similarity between the company the court is valuing and the companies used for comparison."[118]  Petitioners bear the burden of proving that Puglisi's "comparables are truly comparable."[119]  Because they fail to meet their burden, the Court gives no weight to Puglisi's comparable companies analyses.[120]

### 1. AutoInfo is Significantly Smaller than Puglisi's Supposed Comparables

The Court may reject comparable companies analyses based on purported comparables that differ significantly in size from the company being appraised.[121]

---

[118] *In re Radiology Assocs., Inc. Litig.*, 611 A.2d 485, 490 (Del. Ch. 1991).
[119] *In re AT & T Mobility Wireless Operations Hldgs. Appraisal Litig.*, 2013 WL 3865099, at *2 (Del. Ch. June 24, 2013) (quoting *ONTI, Inc. v. Integra Bank*, 751 A.2d 904, 916 (Del. Ch. 1999)).
[120] Of course, if the Court had accepted that the comparables are truly comparable, it would have needed to test the reliability of the EBITDA figures that Puglisi used as inputs.
[121] *See, e.g.*, *Merion Capital*, 2013 WL 3793896, at *6 ("[I]t would be inappropriate to compare a company with an enterprise value of $14.7 million . . . to a company . . . with an enterprise value more than 25 times higher."); *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 477 (Del. Ch. 2011) (rejecting the comparable companies approach because the comparables were "much bigger than [the subject company] . . . [and] enjoy[ed] better access to capital . . ."); *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *25 n.125 (Del. Ch. Aug. 18, 2006) (finding a comparable companies analysis flawed where the "comparable

It is undisputed that Puglisi's comparables are all significantly larger than AutoInfo. As of the Merger date, their market capitalizations ranged from more than twice, to more than 300 times, AutoInfo's size.[122] All but two of Puglisi's comparables had a market capitalization more than ten times AutoInfo's. While recognizing this fact, Petitioners argue that size, while relevant in other contexts, is not a determining factor here.

Puglisi testified that he did not observe a meaningful relationship between a company's size and its multiple among his comparables. He could not recall "ever discriminating inclusion in comparable companies based on company size . . . [because] size itself should not have an impact on the ultimate valuation."[123] Although there may be little theoretical basis for discriminating comparables based on size, doing so has empirical support and is common both in practice and in this Court.[124] Zmijewski suggests that it would be inappropriate to select comparables

publicly-traded companies all were significantly larger than [the subject company], with one having assets of $587 million as compared to [the subject company's] assets of $126 million . . ."); *Gray v. Cytokine Pharmasciences, Inc.*, 2002 WL 853549, at *9 n.19 (Del. Ch. Apr. 25, 2002) (finding a comparable companies analysis unreliable where the comparables "taken together had a market capitalization with a median 24 times higher than [the appraised company] . . . [and t]he median revenue of the comparable companies was 12 times larger than [the appraised company]").

[122] Puglisi Opening Report Ex. C.

[123] Trial Tr. 155-56 (Puglisi).

[124] *See supra* note 121. *See also* ROBERT W. HOLTHAUSEN & MARK E. ZMIJEWSKI, CORPORATE VALUATION THEORY, EVIDENCE & PRACTICE 525 (Cambridge Business Publishers, LLC 2014). Puglisi did employ a size premium in his DCF

without regard to relative market capitalization without otherwise controlling for risk and other differences.[125]

All else equal, smaller firms are riskier and thus face higher costs of equity capital. This higher cost of capital leads to lower market multiples.[126] Miller, Stephens's representative, suggests

> Typically in this sector, small cap companies tend to be valued at lower multiples. That's generally been the case in the . . . dozen years that I've spent covering this sector. The market tends to ascribe premium multiples to companies that are larger . . . [and] are considered more stable businesses. And therefore, investors are willing to . . . afford those companies . . . a higher trading multiple.[127]

Before delivering its fairness opinion, Stephens performed a comparable companies analysis. Based on its experience in the transportation services industry, Stephens, unlike Puglisi, did not rely on the median multiple of its comparables. It selected a lower multiple range, based on differences between AutoInfo and the comparables, including size, business model, and the quality of management.[128] Stephens grouped its comparable companies by size, which showed a relationship between size and multiples.[129]

---

analysis, thus recognizing the empirically observed size effect whereby the capital asset pricing model understates the returns to small firms. *See* Trial Tr. 198-99 (Puglisi).

[125] Zmijewski Rebuttal Report ¶ 30.

[126] *Id.* at ¶ 28. *See also Merion Capital*, 2013 WL 3793896, at *6.

[127] Miller Dep. 148.

[128] Miller Dep. 154-55.

[129] Stephens's Special Committee Presentation 18.

While Petitioners criticize Stephens's size grouping as arbitrary and self-serving, in its initial July 29, 2011, Strategic Initiatives Overview presentation to AutoInfo, Stephens highlighted the fact that AutoInfo had "consistently traded at valuation multiples well below its peer group due to the Company's relatively small scale . . . ."[130] Petitioners have failed to show that the size difference between AutoInfo and Puglisi's supposedly comparable companies is immaterial.[131]

### 2. AutoInfo's 100% Agent-Based Model

Puglisi did not consider the differences between freight brokerage businesses that use the company store model and those that employ an agent-based model as important for valuation purposes.[132] As described in Section I.A above, in a company store model, "[b]rokers are direct employees of the company," while in an agent-based model, the brokers are independent contractors.[133] According to

---

[130] Stephens's Strategic Initiatives Overview 5.

[131] Petitioners note the Court's usual skepticism of "an expert [who] throws out his sample and simply chooses his own multiple in a directional variation from the median and mean that serves his client's cause . . . ." *In re Orchard Enters., Inc.*, 2012 WL 2923305, at *11 (Del. Ch. July 18, 2012). While Petitioners contend that Puglisi's use of a median multiple is thus preferable to accepting Stephens's lower numbers, AutoInfo has not suggested that the Court rely on any comparable companies analysis. Also, Stephens's choice of multiple was not a post hoc determination made during litigation, but a reasoned selection based on its industry experience. Regardless, the Court need not consider the soundness of Stephens's choice to view Puglisi's methodology as unreliable.

[132] Puglisi Dep. 125.

[133] L.E.K. Consulting Due Diligence Presentation 32.

Miller, who has years of experience in the transportation sector, "agent-based models . . . are generally less desirable. They're perceived as riskier. The company does not have control over the customer relationship. The agent does. And so the agent-based models are generally . . . less desirable and generally they tend to trade at lower multiples than the company store models."[134]

That the market perceives the agent-based model as inferior was corroborated by the reaction that one AutoInfo stockholder received while soliciting topping bids for the Company. That stockholder learned that "the agent-based model with no company-owned locations, especially in important shipping hubs, was a bigger deal to potential acquirers than . . . [initially] realized."[135] AutoInfo's 100% agent-based model was a "problem" for potential buyers.[136]

At trial, Puglisi, who lacks Miller's experience in the freight brokerage sector, could not identify which of his comparable companies used which type of business model, but suspected that the majority were agent-based.[137] Miller testified specifically regarding the business models of Stephens's comparables and

---

[134] Trial Tr. 304 (Miller). Miller testified regarding the many differences between AutoInfo and the supposedly comparable companies. *See* Trial Tr. 302-15 (Miller).
[135] JX 357 (email exchange regarding AutoInfo's valuation).
[136] JX 346 (email to uninterested solicited buyer).
[137] Trial Tr. 238-39 (Puglisi).

explained that they mostly use company store models.[138] In its fairness opinion, Stephens had taken advantage of its industry experience and its knowledge of AutoInfo's business to select a below-median multiple for its comparable companies analysis.[139] Petitioners have not established that the differences between AutoInfo's business model and those of Puglisi's comparable companies are unimportant.

3. Summary of Puglisi's Comparable Companies Analyses

Because the weight of the evidence suggests that size and business model affect the multiples at which companies trade in the freight brokerage industry, Puglisi's comparable companies analyses are not reliable indicators of value. The Court's confidence in this conclusion is bolstered by the facts that (i) all of the bids received by AutoInfo during the sales process implied market multiples well below Puglisi's, and (ii) AutoInfo ultimately sold, through a thorough sales process, at a price less than half of Puglisi's comparable companies valuations.[140] The Court was unable independently to derive in any reasoned manner a valuation multiple from the purported comparables. Accordingly, the Court gives no weight to any comparable companies analysis.

---

[138] Trial Tr. 302-14 (Miller). Some companies used a mixed model. AutoInfo used a 100% agent-based model.
[139] Trial Tr. 314-15 (Miller).
[140] *See* RX-9; RX-10 (demonstrative exhibits charting market multiples implied by bids for AutoInfo).

D. *Merger Price*

Zmijewski, AutoInfo's expert, relies on the Merger price as a reliable indication of AutoInfo's fair value at the time of the Merger. "[W]here no comparable companies, comparable transactions, or reliable cash flow projections exist, . . . the merger price [may be] the most reliable indicator of value."[141] Nonetheless, the Court will give little weight to a merger price unless the record supports its reliability.

The dependability of a transaction price is only as strong as the process by which it was negotiated.[142] For example, a transaction that implicates self-interested parties or an inadequate market check may generate a price divergent from fair value. Conversely, where a company "was marketed to potential buyers . . . [through a process that was] thorough, effective, and free from any spectre of self-interest or disloyalty," the outcome of that process is significant.[143]

Petitioners argue that the Merger price deserves no weight because (i) the Merger price is not a business valuation methodology, (ii) the Court cannot rely on the price if no business valuation methodology, *e.g.*, a DCF analysis, was performed to corroborate the price, and (iii) even if the Merger price could be considered, AutoInfo's sales process was deficient.

---

[141] *Huff*, 2013 WL 5878807, at *13.
[142] *Id.*
[143] *Id.*

28

Petitioners' first two contentions are easily dismissed. As discussed, this Court can, and has, relied on a merger price when appraising a company. When it is the best indicator of value, the Court may assign 100% weight to the negotiated price.[144] Although the Court may not presumptively defer to price, no particular valuation methodology must provide corroboration. Rather, the Court may, in its discretion, look to any "evidence tending to show that [the merger price] represents the going concern value of the company rather than just the value of the company to one specific buyer."[145] Here, evidence regarding AutoInfo's sales process substantiates the reliability of the Merger price.

The manner by which AutoInfo was sold is described in Section I.C. above. This case does not involve self-interest or disloyalty; nothing like a controlling stockholder's freezing out the minority is at issue. The Merger was negotiated at arm's length, without compulsion, and with adequate information. It was the result of competition among many potential acquirers. However, Petitioners argue that the sales process was flawed and cannot be expected to have produced a price representative of value. Based on the evidence, the Court concludes that Petitioners' objections, discussed next, are either unwarranted or overblown.

---

[144] *See, e.g.*, *Union Ill. 1995 Inv. Ltd. P'ship v. Union Fin. Gp., Ltd.*, 847 A.2d 340, 357 (Del. Ch. 2004).
[145] *M.P.M. Enters., Inc. v. Gilbert*, 731 A.2d 790, 797 (Del. 1999).

1. Lack of Analyst Coverage

AutoInfo was thinly traded and lacked financial analyst coverage. Petitioners contend that the market underpriced the Company because it was ignorant of its potential. While "[t]he court cannot defer to market price as a measure of fair value if the stock has not been traded actively in a liquid market,"[146] the Merger price does not reflect the value that a potentially uninformed market attributed to AutoInfo. The Merger price represented a 22% premium to AutoInfo's average stock price during the six months before February 28, 2013, the last trading day before public announcement of the Merger.[147] At no time in the two years before the Merger's announcement had the market price for the Company's stock reached $1.00.[148] Further, the Merger price exceeded the highest price that AutoInfo stock had reached during the previous five years.[149]

To shop the Company, AutoInfo retained an experienced investment bank with knowledge of the transportation industry. Stephens's fee had an incentive-based component, which allowed the bank to earn a higher percentage fee the

---

[146] *Applebaum v. Avaya, Inc.*, 812 A.2d 880, 890 (Del. 2002). In fact, as discussed, in an appraisal, the Court may never defer to market price without independently testing its reliability.
[147] Apr. 1, 2013, AutoInfo Schedule 14A at 31.
[148] *Id.*
[149] Stephens's Special Committee Presentation 11.

larger the deal.[150]  Stephens reached out to and provided information on AutoInfo to many potential bidders.  Part of the reason for hiring the bank would have been to educate the market and assure the Company that it was not leaving value on the table.[151]  The Board formed a Special Committee to pursue the sales process. Ultimately, AutoInfo was sold at a premium to market.  Despite attempts by a stockholder to solicit interest, no topping bid emerged during the time frame between announcement and closing of the Merger.[152]  While the market may have been uninformed about AutoInfo before the sales process, it subsequently gained ample information.

### 2. Alleged Pressure from Large Stockholders

Petitioners contend that large stockholders pressured the Board to sell quickly.  Approximately 31.4% of AutoInfo's voting power was held by Baker Street and Kinderhook.[153]  According to Petitioners, those hedge funds sent a clear message that if a liquidity event were not achieved, then they would get active and Management would potentially face a control contest.

---

[150] Trial Tr. 280 (Miller).

[151] In explaining Stephens's request that the Management Projections be optimistic, Miller stated "You certainly don't want to be conservative and leave potential shareholder value on the table."  Trial Tr. 282 (Miller).

[152] One investment advisor who had initially been skeptical of the merger concluded, after learning of the issues associated with an agent-based model, that "the deal was done at a fair, or very close to fair, price."  JX 357 (email to the soliciting stockholder).

[153] Kinderhook held an 18.4% stake and Baker Street held 13%.

Baker Street purchased its stake in the Company in November 2011. By that time, AutoInfo had already begun to consider strategic alternatives, including a potential sale. The Board had reached out informally to potential purchasers months before Baker Street became a stockholder. Stephens's July 29, 2011, presentation to AutoInfo had indicated "that now is an opportune time to explore initiatives to maximize shareholder value, including . . . [a c]hange of control transaction."[154] By the time Baker Street arrived on the scene, AutoInfo was already contemplating the selection of a bank to lead the formal sales process.[155]

Unlike Baker Street, Kinderhook was not adamant that AutoInfo be sold. Rather, like the Board, Kinderhook desired change to address AutoInfo's low stock price.[156] Patterson, the Special Committee's chair, testified that neither Baker Street nor Kinderhook impacted the sales process. Before retaining Stephens, the Board had received early indications of interest and "absolutely" could have sold quickly if the terms had been right.[157] Instead, the Board retained Stephens and embarked on a sales process lasting over a year. Near the end of that process, Patterson told the rest of the Special Committee "I plan to tell [Comvest] to pay $1.06 or walk away."[158] If necessary, the Special Committee was prepared to

---

[154] Stephens's Strategic Initiatives Overview 5.
[155] Trial Tr. 20 (Patterson).
[156] Trial Tr. 23-24 (Patterson).
[157] Trial Tr. 32 (Patterson).
[158] JX 277 (email from Patterson to other Special Committee members).

"regroup, push some changes through and clean up" for a future sale.[159]  Based on the evidence, neither Baker Street nor Kinderhook appear to have materially impacted the sales process.

### 3. Negotiations with Comvest

Petitioners next argue that Comvest completely overwhelmed AutoInfo's Management and Board during negotiations.  More specifically, they contend that Comvest commissioned the McGladrey Report as a tool to drive down the Merger price.  According to Petitioners, AutoInfo was incapable of adequately responding to that report.

Hiring an accounting firm to conduct due diligence is standard practice for Comvest.[160]  While due diligence sometimes flags issues, in other cases, the process is positive and the accounting firm concludes that the target company is actually a better deal than Comvest initially believed.[161]  McGladrey was not the only outside firm hired to conduct due diligence.  For example, Comvest engaged a strategy consultant, whose review of AutoInfo's business was very positive.[162]

---

[159] *Id.* Petitioners argue that Baker Street had demanded a deal by June 2012 and had suggested that any sale at or above $1.00 per share would suffice.  The Board did not approve the Merger until 2013 and the Special Committee was "not comfortable" with a $1.00 price. *See id.*
[160] Trial Tr. 451-52 (Caple).
[161] Trial Tr. 452-53 (Caple).
[162] Trial Tr. 445-46 (Caple).

It is mostly undisputed that AutoInfo's CFO was below-average, the Company used relatively unsophisticated accounting software, and its accounting records contained errors discovered throughout negotiations. There is room to debate whether all of McGladrey's adjustments to AutoInfo's financials were necessary. However, the record does not support the notion that McGladrey's auditors would have sacrificed their professional independence to benefit Comvest on this one particular transaction. AutoInfo did attempt to rebut the McGladrey Report, but many of McGladrey's findings "were valid issues."[163] Because AutoInfo had sub-par accounting and financial controls, McGladrey was understandably alert to potential problems, and Comvest was understandably concerned by the issues raised. Comvest viewed the agreement it eventually reached with AutoInfo as inferior to the deal it had initially anticipated.[164] The record does not support the allegation that McGladrey was a hired gun employed to overwhelm AutoInfo.[165]

---

[163] Trial Tr. 334 (Miller); *see also* Trial Tr. 105 (Patterson).

[164] Trial Tr. 458 (Caple).

[165] Those contacted by an AutoInfo stockholder soliciting topping bids for the company shared at least some of McGladrey's concern. *See, e.g.*, JX 320 (email from accountant questioning "why . . . a Shelton, CT based firm (not even a regional firm) [would] be auditing a Miami based company . . ."); JX 325 (email from disinterested party stating: "Just as a personal aside I also wonder about the accounting. They convert notes to goodwill ($10M) in exchange for cash flow but then they don't amortize the goodwill against that cash flow at all. I doubt that cash flow will continue infinitely.").

4. Stephens's Process

Petitioners suggest that (i) Stephens's market canvas was unfocused, (ii) Stephens improperly suggested a valuation of AutoInfo to some bidders, (iii) Stephens did not provide a formal valuation of the Company until the Merger was negotiated, and (iv) the Board did not adequately oversee the sales process.

The sales process is described *supra* Section I.C. The weight of the evidence discredits Petitioners' stated concerns. The Court concludes that the sales process was generally strong and can be expected to have led to a Merger price indicative of fair value. Accordingly, it deserves weight in the Court's valuation.

E. *The Court's Determination*

Any real-world sales process may be criticized for not adhering completely to a perfect, theoretical model. Nonetheless, AutoInfo's process was comprehensive and nothing in the record suggests that the outcome would have been a merger price drastically below fair value, as Petitioners' expert suggests. Placing heavy weight on the Merger price "is justified in light of the absence of any other reliable valuation analysis."[166] Not only are other credible valuations unavailable, but the record also contains evidence corroborating the Merger price's reliability. Even Petitioners' expert agrees that AutoInfo was "shopped quite a bit"

---

[166] *Huff*, 2013 WL 5878807, at *13.

and that the sales process was arm's length.[167] The Merger was the result of "an adequate process."[168] The Merger price is thus a strong indicator of value.[169]

Before placing full weight on the Merger price, the Court performed its own DCF analysis. Having rejected the Management Projections, the Court relied on financial projections that Comvest had prepared for internal use in evaluating the AutoInfo deal.[170] In a February 25, 2013, Investment Committee Memo, Comvest projected five-year financials for AutoInfo based on both a base case (the "Base Case Projections") and a downside case scenario. Comvest's projections were prepared during due diligence to provide more detail than the Management Projections. They represented Comvest's then-current belief regarding AutoInfo's likely future performance.[171] After Comvest's investment committee requested "a number of alternative scenarios below the down side case," a revised downside case and a "shock case" were also produced.[172]

When preparing his expert report, Zmijewski considered using the Base Case Projections in a DCF valuation. While he concluded that those projections would not yield a reliable indication of fair value, he did use them to conduct a

---

[167] Trial Tr. 221-22 (Puglisi).
[168] Trial Tr. 222 (Puglisi).
[169] Delaware law does not require that a sales process conform to any theoretical standard. *Huff*, 2013 WL 5878807, at *14.
[170] *See* JX 282 (email to Caple attaching Comvest's presentation to its investment committee).
[171] Trial Tr. 449 (Caple).
[172] Trial Tr. 450-51 (Caple).

DCF analysis included in his rebuttal report. AutoInfo has argued that Comvest's projections are a better forecast of the Company's future performance as of the date of the Merger than are the Management Projections.

In his rebuttal expert report, Puglisi analyzed the Comvest Base Case Projections. He considered them reasonably reliable, observing that

> after months of due diligence and hundreds of thousands of dollars spent, up until days prior to the stockholder vote on the transaction, Comvest continued to focus its internal investment committee presentations on its Base case projections, including in its closing memo, noting the Company's strong 2013 first quarter results, and highlighting that the Company had outperformed revenue and gross margins stated in its Base case projections.[173]

Because the Base Case Projections are the most reliable forecast in the record, the Court employed them in its DCF analysis. The Court generally adopted the DCF framework used by Zmijewski in his rebuttal expert report.[174] However, as explained in Section 3.F below, the record does not support Zmijewski's decision to remove $1,449,000 per year (before tax) in purported merger cost savings. The Court added back that value to arrive at a corrected estimate of AutoInfo's forecasted free cash flows. The Court otherwise credited the

---

[173] JX 382 (Puglisi Rebuttal Report) at 10.

[174] Despite the gulf between the parties' fair value estimates, there is little dispute over the appropriate DCF model. Rather, the parties disagree on whether there are reliable inputs to run a DCF and the appropriate equity size premium, which impacts AutoInfo's cost of equity and thus its weighted average cost of capital.

uncontroversial assumptions underlying Zmijewski's model, as well as his use of 17.57% as AutoInfo's weighted average cost of capital ("WACC").

The parties disagree on AutoInfo's WACC, which is used in a DCF analysis to discount cash flow projections and a terminal value to estimate the Company's enterprise value as of the Merger. Zmijewski used a WACC of 17.57%, while Puglisi used 11.30%. The difference stems entirely from debate regarding the appropriate equity size premium to be added to AutoInfo's cost of equity.[175] The most common method for estimating a company's cost of equity, and the method employed by both experts, is application of the capital asset pricing model (the "CAPM"). Because empirical evidence suggests that the CAPM understates small companies' costs of equity, valuation professionals often add a size premium, based on historically observed data, to a CAPM-derived cost of equity.[176] Zmijewski and Puglisi each added a size premium to AutoInfo's CAPM-based cost of equity; Zmijewski used 11.65%, and Puglisi selected 3.81%.

Following standard practice, both experts derived the size premium using data from Ibbotson Associates ("Ibbotson"). The 2013 edition of Ibbotson breaks down publicly traded stocks into deciles based on market capitalization.[177] It further breaks down the 10th decile, which includes the smallest companies, into

---

[175] *See* RX-1 (demonstrative exhibit comparing the experts' WACC calculations).
[176] SHANNON P. PRATT & ROGER J. GRABOWSKI, COST OF CAPITAL: APPLICATIONS AND EXAMPLES 232-61 (John Wiley & Sons, Inc. 4th ed. 2010).
[177] JX 201.

four subdeciles. Subdecile 10z subsumes the smallest companies in Ibbotson's data set.

Puglisi chose the size premium for Ibbotson's micro-cap category, which includes the 9th and 10th deciles, *i.e.*, companies with market capitalizations ranging from $1.139 million to $514.209 million. Zmijewski looked to the 10z subdecile, which consists of companies with market capitalizations from $1.139 million to $96.164 million. At the time of the Merger, AutoInfo had a market capitalization of approximately $30 million. AutoInfo thus fell comfortably within subdecile 10z based on its market capitalization. For several reasons, the Court relied on the 10z size premium.

First, Puglisi testified that he "would have used [a size premium] close to the 10z category, if not 10z itself," had he not believed it necessary to strip out a marketability factor.[178] Puglisi's adjustment to the size premium runs counter to Delaware law.[179] In *Gearreald v. Just Care, Inc.*, this Court "decline[d] to reduce the Company's size premium to less than what is implied by its actual size."[180] In that case, as here, the parties agreed as to which Ibbotson subdecile applied based on size alone, yet petitioners' expert used a lesser size premium to "eliminate[e]

---

[178] Puglisi Dep. 156.
[179] *See Gearreald v. Just Care, Inc.*, 2012 WL 1569818, at *10-12 (Del. Ch. Apr. 30, 2012).
[180] *Id.* at *12.

the 'well-documented liquidity effect' contained within the size premium."[181]  The

Court rejected the adjustment "because the liquidity effect at issue relate[d] to the

Company's ability to obtain capital at a certain cost, . . . [and was therefore] related

to the Company's intrinsic value as a going concern and should be included when

calculating its cost of capital."[182]  Petitioners attempt to distinguish between a

marketability discount and an illiquidity discount, which may represent distinct

concepts in a separate context.  However, AutoInfo's cost of capital directly affects

transactions between the Company and providers of capital, and is thus part of its

value as a going concern.  Because in these circumstances there is an insufficient

factual basis for doing so, the Court declines to depart from the size premium

implied by AutoInfo's actual size.[183]

The Court also considered the fact that Stephens, when valuing AutoInfo,

used a size premium and WACC even higher than what Zmijewski recommends.

Stephens believed that AutoInfo would need to significantly increase its market

capitalization to benefit from a lower WACC.[184]  Perhaps most importantly,

relying on Puglisi's WACC produces an estimate of fair value completely divorced

---

[181] *Id.* at *10.
[182] *Id.* at *11.
[183] *Id.* at *12.  While Ibbotson no longer publishes 10z size premium data, Duff & Phelps, LLC has "pick[ed] up the mantle."  Trial Tr. 590 (Zmijewski).  Duff & Phelps is a widely used and well-respected source of size premium data.  *See* Pratt & Grabowski, *supra* note 176, at 110.
[184] Stephens's Strategic Initiatives Overview 12.

from the negotiated Merger price (and the other bids offered for the Company). The discrepancy between Puglisi's estimates and the market's valuation of AutoInfo cannot be explained by anything in the record.[185]

Using a WACC of 17.57% and the Base Case Projections, the Court performed a DCF analysis that resulted in a fair value determination of approximately $0.93 per share on the date of the Merger.[186] Under Delaware law, it would be appropriate to provide weight to the value as implied by the Court's DCF analysis.[187] Nonetheless, because the Merger price appears to be the best estimate of value, the Court will put full weight on that price.[188]

F. *Must the Merger Price Be Adjusted for Cost Savings?*

While the Merger price was the baseline for Zmijewski's fair value opinion, he adjusted that amount downward to account for the portion of the price that he deemed attributable to the consummation or prospect of the Merger.[189] In this, as in any appraisal action, the Court must value Petitioners' shares "exclusive of any element of value arising from the accomplishment or expectation of the

---

[185] *Cf. Union Ill. 1995 Inv. Ltd. P'ship*, 847 A.2d at 359 n.43 (citing to a highly-regarded corporate finance text for the proposition "that if the DCF analysis you perform of a stock does not match the market price, you have probably used poor forecasts").

[186] The Base Case Projections were provided to the Court in native format at JX 390. The Court used Zmijewski's basic model, as set forth in his rebuttal report.

[187] *See Union Ill. 1995 Inv. Ltd. P'ship*, 847 A.2d at 364.

[188] *Id.*

[189] Zmijewski's fair value estimate was thus below the Merger price.

merger . . . ."[190]    AutoInfo argues that two categories of cost savings, which increased the price that Comvest was willing to pay for it, must be backed out of the Merger price to arrive at AutoInfo's fair value as a going-concern as of the Merger date.  Those categories are (i) public company costs that Comvest could eliminate once AutoInfo ceased trading as a public company, and (ii) executive compensation costs that Comvest planned to eliminate.  AutoInfo bears the burden of showing that adjustments should be made to the Merger price.[191]

Zmijewski suggests backing out these cost savings because AutoInfo's stockholders likely captured 100% of the value created by those savings and, thus, the value is embedded in the Merger price.[192]  He cites academic literature that concludes that target firms capture virtually all of the value created by corporate combinations through the price paid by the acquirer.[193]  Because the $1.05 price would be expected to reflect anticipated cost savings, Zmijewski adjusted the Merger price downwards to account for Merger-related effects on the stock's value.

---

[190] 8 *Del. C.* 262(h).
[191] *See Huff Fund Inv. P'ship v. CKx, Inc.*, 2014 WL 2042797, at *2 (Del. Ch. May 19, 2014), *aff'd*, -- A.3d --, 2015 WL 631586 (Del. Feb. 12, 2015) ("*Huff Fund*").
[192] Zmijewski Opening Report ¶ 98.
[193] *Id.* at ¶ 97.

This Court only excludes from an appraisal award value that is merger-specific.[194] An appraisal award does not include "the amount of any value that the selling company's shareholders would receive because a buyer intends to operate the subject company, not as a stand-alone going concern, but as a part of a larger enterprise, from which synergistic gains can be extracted."[195]

Zmijewski based his calculation of cost savings on adjustments that Comvest made to AutoInfo's earnings when preparing the Base Case Projections. Comvest apparently anticipated savings related to public company costs and executive compensation. It assumed that the savings would not grow over time and would persist into perpetuity.[196]

In *Huff Fund*, the respondent company urged the Court to subtract $0.29 from the merger price to arrive at fair value.[197] Its rationale was that prior to the merger, the acquirer had identified $4.6 million in annual cost savings that it hoped to realize by converting the target from a publicly held corporation to a privately held firm.[198] The evidence for those anticipated cost savings was an investment memorandum that the acquirer had prepared. The Court did not need to "reach[] the theoretical question of under what circumstances cost-savings may constitute

---

[194] *Huff Fund*, 2014 WL 2042797, at *3.
[195] *Union Ill. 1995 Inv. Ltd. P'ship*, 847 A.2d at 356.
[196] Zmijewski Opening Report ¶ 100.
[197] *Huff Fund*, 2014 WL 2042797, at *3.
[198] *Id.*

synergies excludable from going-concern value under Section 262(h)" because the record did not establish that the acquirer had based its bid on cost savings that the target could not have itself realized had it continued as a going concern.[199]

Accepting Zmijewski's adjustments would appear to require the Court to reduce for cost savings the fair value established in an appraisal proceeding through reliance on the transaction price. Allowing a near automatic reduction in price would reverse the burden that is on the party arguing that adjustments are warranted. Zmijewski derived his cost savings figures from three lines of data included in Comvest's development of its Base Case Projections.[200] The Court does not know how Comvest arrived at its numbers or even what it included as "public company costs." Unlike the Merger price, which was corroborated by a thorough and public sales process, the reliability of the purported cost savings has not been tested.[201] AutoInfo has thus failed to establish that any downward adjustment to the Merger price is warranted.[202]

---

[199] *Id.*

[200] Zmijewski Opening Report ¶ 100. AutoInfo cites to one other one-page document that purports to show Comvest's plan to save on executive compensation. *See* JX 348. No context for that document was provided and Zmijewski did not rely on it in calculating cost savings.

[201] Because AutoInfo has failed to provide adequate evidence to support its adjustments to the Merger price, the Court need not reach the issue of whether similar cost savings would be excluded from fair value in another context.

[202] Further, AutoInfo has not established that the executive compensation cost savings, which represent the bulk of Zmijewski's adjustments, could only have been realized through accomplishment of a merger. The Special Committee

# IV. CONCLUSION

Where, as here, the market prices a company as the result of a competitive and fair auction, "the use of alternative valuation techniques like a DCF analysis is necessarily a second-best method to derive value."[203] The result of a DCF analysis depends critically on its inputs. For example, small changes to the assumed cost of capital can dramatically impact the result.

AutoInfo's expert, a tenured professor at the University of Chicago Booth School of Business, concluded that there is no reliable data to input into a DCF or comparable companies model. He determined that the process by which AutoInfo was marketed and sold would be expected to have led to a price indicative of the fair value of the Company's stock. The Court has independently reached these same conclusions.

For the reasons set forth above, the fair value of one share of AutoInfo at the time of the Merger was $1.05. Petitioners are entitled to interest at the legal rate. Counsel are requested to confer and to submit an implementing form of order.

---

expected that if the Comvest deal fell through, the Board would push through Management-related changes in the hope of increasing share price. *See, e.g.*, JX 277 (Patterson email to other Special Committee members).
[203] *Union Ill. 1995 Inv. Ltd. P'ship*, 847 A.2d at 359.